# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Behrooz Taghivand, Plaintiff,

v.

Rite Aid Corporation, Eckerd Corporation, d/b/a Rite Aid, and Steve Smith, Defendants.

Appellate Case No. 2014-000073

---

## CERTIFIED QUESTION

---

ON CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA

Richard M. Gergel, United States District Judge

---

Opinion No. 27485
Heard September 23, 2014 – Filed January 28, 2015

---

## CERTIFIED QUESTION ANSWERED

---

Allan R. Holmes, Sr. and Timothy O. Lewis, both of Gibbs & Holmes, of Charleston, for Plaintiff.

Benjamin P. Glass and Luci L. Nelson, both of Ogletree, Deakins, Nash, Smoak, & Stewart, P.C., of Charleston, for Defendants.

---

**JUSTICE HEARN:**  This certified question from the federal district court asks us to delineate the parameters of the public policy exception to the doctrine of at-will employment.  Specifically, this question requires us to consider whether the public policy exception is broad enough to permit a cause of action in tort for employees who are terminated for reporting a suspected crime, in this case, shoplifting.  We hold it does not.

## FACTUAL/PROCEDURAL HISTORY

The facts are drawn from the district court's certification order.  Behrooz Taghivand was the manager of a Rite Aid store in a high crime area of North Charleston, South Carolina.  While on duty, Taghivand observed a patron acting strangely and milling around the store with no apparent purpose.  The patron stopped briefly in the section directly in front of the cashier, selected a few items, and made a purchase.  After the patron checked out, the cashier told Taghivand that when the patron entered the store, he was carrying a bag that appeared to be empty but now had items in it.

Taghivand instructed the cashier to call the police.  An officer arrived at the scene and gathered together the items the patron claimed he purchased from the store, and Taghivand confirmed these as belonging to the patron.  The officer also searched the patron's bag, and found it contained only dirty clothes.

Taghivand was terminated effective that day, and was informed the incident was the reason for his termination.  As a result, Taghivand filed this action against Rite Aid Corporation, Eckerd Corporation d/b/a Rite Aid, and Steve Smith in federal court for wrongful termination; the defendants moved to dismiss.  After finding that South Carolina law was not clear on the issue raised by the motion to dismiss, the district court certified this question.

## CERTIFIED QUESTION

Under the public policy exception to the at-will employment doctrine in South Carolina, does an at-will employee have a cause of action in tort for wrongful termination where (1) the employee, a store manager, reasonably suspects that criminal activity, specifically, shoplifting, has occurred on the employer's premises, (2) the employee, acting in good faith, reports the suspected criminal activity to law enforcement, and (3) the employee is terminated in retaliation for reporting the suspected criminal activity to law enforcement?

## LAW/ANALYSIS

Taghivand first argues that there are specific statutory and common law authorities which establish a clear mandate of public policy favoring the reporting of crimes, and second, that there is a general public policy favoring the reporting of crimes inherent in the functioning of this state's criminal justice system. We find neither of these arguments availing.

South Carolina has a strong policy favoring at-will employment. *Prescott v. Farmers Tel. Coop., Inc.*, 335 S.C. 330, 335, 516 S.E.2d 923, 925 (1999). As we have explained before, "the policy of employment at-will provides necessary flexibility for the marketplace and is, ultimately, an incentive to economic development." *Id.* Accordingly, absent a contractual provision to the contrary, an employee may be terminated at any time for any reason or no reason, with or without cause. *Barron v. Labor Finders of S.C.*, 393 S.C. 609, 614, 713 S.E.2d 634, 636 (2011).

However, our adherence to the at-will employment doctrine is not without limits. Under the public policy exception, an employee who is terminated in violation of a clear public policy may pursue a cause of action in tort for wrongful termination. *Ludwig v. This Minute of Carolina, Inc.*, 287 S.C. 219, 225, 337 S.E.2d 213, 216 (1985). Courts have invoked the public policy exception in two instances: (1) where an employer requires an employee, as a condition of continued employment, to break the law, *see id.*, and (2) where an employer's termination is itself illegal, *see Culler v. Blue Ridge Elec. Coop., Inc.*, 309 S.C. 243, 422 S.E.2d 91 (1992). While we have made clear that the exception "is not limited to these situations," we have specifically recognized no others. *Barron,* 393 S.C. at 614, 713 S.E.2d at 637.

We exercise restraint when undertaking the amorphous inquiry of what constitutes public policy. As the United States Supreme Court has recognized, "public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, *only with the utmost circumspection.*" *Patton v. United States*, 281 U.S. 276, 306 (1930), *abrogated by Williams v. Florida*, 399 U.S. 78 (1970) (emphasis added). This comports with our understanding that "[t]he primary source of the declaration of the public policy of the state is the General Assembly; the courts assume this prerogative only in the absence of legislative declaration." *Citizens' Bank v. Heyward*, 135 S.C. 190, 204, 133 S.E. 709, 713 (1925).

Taghivand points to three specific statutory and common law authorities which he argues establish the basis for a public policy exception to protect the good faith reporting of suspected crime: Section 16-9-340 of the South Carolina Code (2003), common law obstruction of justice, and Section 16-3-1505 of the South Carolina Code (2003). We disagree that any clear or articulable public policy emanates from these authorities.

Section 16-9-340 reads in pertinent part: "It is unlawful for a person by threat or force to . . . intimidate or impede a judge, magistrate, juror, witness, or potential juror or witness . . . in the discharge of his duty as such." § 16-9-340(A)(1). Taghivand's argument is that section 16-9-340 protects those involved in legal proceedings—potential witnesses included—from intimidation or interference that is connected with their role in the proceedings. As an extension, Taghivand argues that the public policy behind this statute should give rise to his cause of action for wrongful termination.

The fallacy underlying Taghivand's argument is that his employer terminated him *in response* to the reporting of a crime, not to influence or impede his further involvement in any proceeding related to that crime. The thrust of Taghivand's argument is not that section 16-9-340 applies to him as a potential witness in the reported shoplifting, but rather, that a broad public policy favoring the reporting of crimes can be derived from the legislature's decision to protect potential witnesses. We find the plain language of the statute does not support his assertions. Taghivand was not prevented by threat or force from participating in a legal proceeding; he was discharged for incorrectly reporting a crime. Without a more definite statement from the General Assembly that the reporting of crime should be protected, we refuse to read such a policy into this statute.[1]

---

[1] This is the same reasoning applied in the authority from Maryland cited by Taghivand. Although Maryland's highest court found the public policy exception to apply where an employee was fired after reporting a suspected crime, the statute it relied upon, while similar to that which exists in South Carolina, also protects those people "reporting a crime or delinquent act." *Wholey v. Sears Roebuck*, 803 A.2d 482, 498, 500 (Md. 2002). In fact, in an earlier case interpreting the Maryland statute *before* it was changed to apply to those who reported suspected crimes, the same court refused to recognize a public policy exception. *Adler v. Am. Standard Corp.*, 432 A.2d 464 (Md. 1981). The change in the statute by the legislature was the basis of the Maryland court's later decision, and we apply the same judicial restraint today.

Taghivand also argues to the extent section 16-9-340 does not lay out a general public policy favoring the reporting of suspected crime, its common law equivalent does. He bases this assertion on the offense of obstruction of justice, which criminalizes doing "any act which prevents, obstructs, impedes, or hinders the administration of justice." *State v. Codgell*, 273 S.C. 563, 567, 257 S.E.2d 748, 750 (1979). However, he is not arguing his employer obstructed justice in this case; rather, his argument is that a broad public policy protecting those who report suspected crimes can be read from the common law of obstruction of justice. Accordingly, for the same reason as above, we find his argument unpersuasive.

As to section 16-3-1505, which is the legislative intent section of the Victim and Witness Service Act, Taghivand argues it lays out a general public policy favoring the reporting of suspected crimes. The relevant part of the section reads:

> In recognition of the civic and moral duty of victims of and witnesses to a crime to cooperate fully and voluntarily with law enforcement and prosecution agencies, and in further recognition of the continuing importance of this citizen cooperation to state and local law enforcement efforts and to the general effectiveness and the well-being of the criminal and juvenile justice systems of this State, and to implement the rights guaranteed to victims in the Constitution of this State, the General Assembly declares its intent, in this article, to ensure that all victims of and witnesses to a crime are treated with dignity, respect, courtesy, and sensitivity; that the rights and services extended in this article to victims of and witnesses to a crime are honored and protected by law enforcement agencies, prosecutors, and judges in a manner no less vigorous than the protections afforded criminal defendants . . . .

§ 16-3-1505. As this Court has recognized, the primary purpose of the Victim and Witness Service Act is to ensure "victims are informed of their rights and any alternative means that might be available to them if the criminal prosecution is unable to meet their needs." *Ex Parte Littlefield*, 343 S.C. 212, 218, 540 S.E.2d 81, 84 (2000). Thus, while the legislative intent section indicates the General Assembly recognizes the importance of the people's civic duty to cooperate with law enforcement, there is no indication the General Assembly intended this concept to extend outside the context of the ongoing criminal proceeding at the heart of this statute. Accordingly, we also find this argument without merit.

Finally, we are unpersuaded by Taghivand's argument that there is a general mandate of public policy for the reporting of crimes inherent in the functioning of this state's criminal justice system. This argument is derived from the holding in the split decision of *Palmateer v. International Harvester Co.*, 421 N.E.2d 876 (Ill. 1981). In *Palmateer*, a manager was terminated after reporting an employee to law enforcement for a violation of the criminal code. *Id.* at 877. Recognizing public policy to be an amorphous concept, the court determined that a matter "must strike at the heart of a citizen's social rights, duties, and responsibilities" to rise to the level of public policy. *Id.* at 878–79. Further, the court held "[t]here is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens," and thus although "[n]o specific constitutional or statutory provision requires a citizen to take an active part in the ferreting out and prosecution of crime . . . public policy nevertheless favors citizen crime-fighters." *Id.* at 879–80.

In one of two *Palmateer* dissents, Justice Ryan stated that the question of public policy is first and foremost a matter of legislative concern. *Id.* at 881. His dissent criticized the majority for recognizing a public policy based not in any expression by the legislature, but rather in the vague concept of citizen crime fighting. *Id.* at 882. While his dissent found the reporting of suspected crime to be "praiseworthy," it concluded the decision of an employer to terminate an employee for this reason does not bring the behavior "within the area of any public policy that has been articulated by the legislature." *Id.* at 884. The dissent's reasoning has been adopted by other courts. *See Hayes v. Eateries, Inc.*, 905 P.2d 778, 786 (Okla. 1995) ("Although we believe most people, including members of this Court, would agree that, generally speaking, the reporting of crimes to appropriate law enforcement officials should be lauded and encouraged . . . we must decide in this case whether the reporting of this particular crime against this particular victim . . . is so imbued with a clear and compelling public policy such that a tort claim is stated if the employer discharges the employee for so reporting. In our view, such reporting is not so protected."); *Wholey*, 803 A.2d at 498 ("[W]e decline to create a tort cause of action based *solely* on transcendental notions of that which is in the public interest, particularly when our own legislature has declined to make individual citizens criminally responsible for failing to investigate or report criminal activity.").

Given our deference to the General Assembly in matters of public policy, we decline to adopt the *Palmateer* majority's reasoning. Unquestionably, society benefits from citizen participation in the criminal justice system, and no one can reasonably dispute that reporting the commission of a crime is a commendable act.

However, the question before us today is not whether this state applauds citizen participation in the criminal justice system, but whether this interest mandates an exception to the at-will employment doctrine.

Moreover, the public policy of this state finds expression in our longstanding adherence to at-will employment; any exception to this doctrine, which is itself firmly rooted in the public policy of this state, should emanate from the General Assembly, and from this Court only when the legislature has not spoken. Absent a more clear and articulable definition of policy from the General Assembly regarding those who report suspected crimes, we refuse to broaden the exception to the at-will employment doctrine today.

## CONCLUSION

For the above stated reasons, we answer the certified question: no.

**TOAL, C.J., BEATTY and KITTREDGE, JJ, concur. PLEICONES, J., concurring in a separate opinion.**

**JUSTICE PLEICONES**:  I agree with the majority that we should answer the certified question "No."  I write separately to express my belief that this Court has the authority to create a public policy exception to the common law at-will employment doctrine,[2] even in the absence of legislative action.  *E.g., Russo v. Sutton*, 310 S.C. 200, 422 S.E.2d 752 (1992) (Court will not hesitate to change common law "when public policy is offended by outdated rules of law").

---

[2] *E.g. Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219, 337 S.E.2d 213 (1985) (court recognized exception to at-will employment doctrine where employee's retaliatory discharge violated clear public policy).