778 S.E.2d 320

**Jacklyn DONEVANT, Respondent,**

v.

**TOWN OF SURFSIDE BEACH, Appellant.**

**Appellate Case No. 2014–000457.**
**No. 5345.**

Court of Appeals of South Carolina.

Heard June 1, 2015.
Decided Aug. 26, 2015.
Rehearing Denied Nov. 19, 2015.

398

Charles Franklin Thompson, Jr., of Malone Thompson Summers & Ott, LLC, of Columbia, for appellant.

Henrietta U. Golding and James Keith Gilliam, both of McNair Law Firm, PA, of Myrtle Beach, for respondent.

LOCKEMY, J.

In this wrongful termination action, the Town of Surfside Beach appeals the trial court's denial of its motion for a directed verdict. The Town argues that by denying its motion for a directed verdict, the trial court erred in expanding the public policy exception to at-will employment beyond situations where the employer requires the employee to violate

criminal law or the reason for the employee's termination itself is a violation of criminal law. The Town further asserts the trial court's denial of its motion was error because the public policy exception does not apply to terminations of government employees who insist on performing an act that is discretionary. We affirm.

## FACTS

This appeal arises from the employment termination of Jacklyn Donevant—the former building official and Director of Planning, Building, and Zoning for the Town. Donevant sued the Town for wrongful termination, alleging it fired her in violation of a clear mandate of public policy. Specifically, Donevant asserted she was fired in retaliation for issuing a stop-work order[1] to a restaurant that was performing construction with only a demolition permit and not a construction permit. At trial, the Town claimed it terminated Donevant for attendance issues, punctuality issues, and insubordination.

### A. Donevant's Case

In 2005, the Town hired Donevant as its building official. In this capacity, Donevant served as the head of the building department and was the only Town employee who could approve building permits or issue stop-work orders. In December 2010, the Town hired Jim Duckett as its town administrator. During Duckett's tenure as administrator, there was an ongoing controversy with the vacancy of the Pier Restaurant—a restaurant located on a pier in Surfside Beach. The Town acquired ownership of the Pier Restaurant in 2008. Shortly thereafter, a long-time tenant of the Pier Restaurant vacated the premises, leaving the space vacant and depriving the Town of expected revenue. The Town had trouble finding a new tenant for the restaurant. The vacancy of the Pier Restaurant became a prominent, public issue in the Town, with stories appearing in several newspaper articles. As administrator for the Town, Duckett worked to help find a new tenant for the restaurant.

Donevant testified that throughout her employment with the Town, she regularly inspected construction sites on her

---

1. A stop-work order "is an order given by the building official to stop work, just completely shut the work down."

way to and from work. On June 17, 2011, Donevant conducted an inspection on her way to work. She called a member of her staff to inform her that she was conducting an inspection and would be in the office after she finished. When Donevant arrived at work, Duckett stopped her before she could walk in her office. Duckett wrote the following sentence on a sheet of paper: "Since Jim Duckett has a poor memory[,] I will ... in the future send him an email if I will not be in to work by [9:00] a.m. each workday." Duckett gave the paper to Donevant and made her write the sentence five times in front of the employees she supervised.

In December 2011, Donevant was diagnosed with breast cancer and received twelve weeks of medical leave from work. During her absence, the Town was forced to contract with the City of Myrtle Beach to perform Donevant's building official duties because no other Town employee was qualified to perform those duties. The City of Myrtle Beach assumed the responsibility of reviewing plans, issuing permits, conducting inspections, and issuing stop-work orders within the Town's jurisdiction.

While Donevant was on leave, Duckett found a new tenant to occupy the vacant Pier Restaurant space. The new tenant wanted to remodel the interior of the space. Because Donevant was on leave, the City of Myrtle Beach issued a demolition permit to the tenant that allowed for "demo interior of building only." This demolition permit was the only permit issued to the Pier Restaurant during Donevant's sick leave; however, the tenant had applied for a construction permit that was pending under "plan review." While Donevant was on leave, Duckett visited the restaurant frequently and remained in contact with the City of Myrtle Beach about the construction plans.

On March 13, 2012, Donevant returned from sick leave. Before allowing her to resume her duties as building official, Duckett required Donevant to meet with him and requested that Debra Hermann, the Town clerk, witness the meeting. During the meeting, Duckett informed Donevant she would resume all of her job duties, but he warned her if she "change[d] anything that was done ... in [her] absence," he would fire her. Duckett testified the reason for this instruc-

tion was to prevent Donevant from revisiting any decisions made by the City of Myrtle Beach during her absence. Hermann prepared a memorandum after the meeting that stated:

Duckett explained that [Donevant] was now officially returned to work; however, he gave her a direct order that she could not and would not change, ameliorate, or in any other manner amend any action that was taken during her absence. That if she did so, she would be fired.

On March 19, 2012, Duckett instructed Micki Fellner, the Town's deputy administrator, to inform Donevant that she could no longer report to Fellner and was required to report directly to Duckett. Duckett had previously informed all employees, including Donevant, that Fellner "was in charge when [Duckett] wasn't there" and Fellner "had the same authority [Duckett] had when [Duckett] was there."

Donevant testified that shortly after returning to work from her sick leave, she discovered by reading a local newspaper article that new construction was underway at the Pier Restaurant. Upon reading the article, Donevant contacted the City of Myrtle Beach and learned no construction permit had been issued. Thereafter, Donevant drove to the Pier Restaurant to inspect the premises. She testified new construction had started at the restaurant. According to Donevant, the contractors had cut openings for doors and windows; studded a new wall; and installed plumbing, electrical, and subflooring. In Donevant's opinion, this work constituted "construction" and therefore required a construction permit before it could be lawfully performed. Donevant testified that allowing unpermitted construction to continue within the Town's jurisdiction posed a significant safety risk to the public. She stated:

[I]t was unsafe and it was dangerous. They had openings that anybody could step in and fall. There was loose wires and plumbing. There was stuff that had [not] been inspected, how do you know whether it [was] safe or not. We have to protect the public. The pier is a busy place. A lot of kids go [out] there....

Donevant issued a stop-work order to halt construction at the Pier Restaurant and taped the stop-work order to the door. After issuing the stop-work order, Donevant called Fellner on her way back to the office. Donevant testified she called

Fellner to discuss an unrelated matter and was not "reporting" to Fellner that she had issued a stop-work order. During the conversation, however, Donevant told Fellner about the stop-work order for the unpermitted construction at the Pier Restaurant.

The next day Duckett called Donevant into his office for a meeting. During the meeting, Duckett told Donevant he could not believe she stopped work at the Pier Restaurant after all the work he had done on the project. Duckett turned his attention to three pieces of paper lying face-down on his desk. Duckett turned over the first piece of paper, which was a written reprimand, stating Donevant had disobeyed his order to report all matters to him and not Fellner. Donevant refused to sign the reprimand, claiming it was untrue because she had not "reported" the stop-work order to Fellner. Donevant further stated Duckett never told her she was required to report the fact that she issued a stop-work order. After Donevant refused to sign the reprimand, Duckett turned over the second piece of paper, which was an order of suspension. Donevant testified that although she disagreed with the suspension, she signed the document and served a three-day suspension because she "needed to work" and suspected the third document on Duckett's desk was a termination notice. According to Donevant, Duckett suspended her "for putting a stop-work order, for doing [her] job."

Donevant returned to work following her suspension on March 25, 2012, and on that date, she delivered a letter to Duckett that stated:

> My suspension was not right. All I did was follow the law, which you did [not] want me to follow. Like I told you the other day, I will follow the law even if that means not following your instructions. You have been picking on me and treating me badly for a long time even though I do my work by the book and I am dedicated to the [T]own.

On April 4, 2012, Duckett terminated Donevant. Donevant testified Duckett did not provide her with a reason for her termination. Duckett later informed the South Carolina Department of Employment and Workforce that her termination was due to "operational changes." Donevant asserted Duckett

fired her in retaliation for issuing the stop-work order for unpermitted construction at the Pier Restaurant.

At trial, Donevant claimed she was required by law to issue the stop-work order at the Pier Restaurant. She presented the testimony of Gary Wiggins, a former director of the South Carolina Building Codes Council. Wiggins testified that Chapter One of the International Building Code (IBC), which the Town had adopted by ordinance, sets forth a building official's authority to issue stop-work orders. He explained "any time there is a potential of life safety or fire safety or there [is] a direct violation of the law, the building official is obligated to issue a stop-work order." If construction is commenced without a construction permit, "[t]hat's a violation of the law. . . . [a]nd anytime there's a violation of the law, a stop-work order must be issued." According to Wiggins, a town administrator does not have the authority to issue stop-work orders. The building official "is charged with that responsibility specifically and no other person . . . can perform that function or task." Wiggins stated that "starting work in any capacity is a violation of the law unless a permit is issued for it." He testified that if a building official neglected to issue a stop-work order when construction is ongoing with only a demolition permit, she could be disciplined by the South Carolina Building Codes Council, with discipline ranging from a letter of caution to a revocation of her license as a building official.

## B. The Town's Case

Duckett testified he was Donevant's immediate superior, and she was required to report directly to him. He stated that as town administrator, he was not involved in permitting or building inspection decisions. Duckett described Donevant as a "problem employee." He testified Donevant was frequently absent from, or late to, work and "[a] lot of times [her] staff didn't know where she was or when she would be back." Duckett eventually required Donevant to be at work by 9:00 a.m. or to let him know "if she was going to be out for any reason." According to Duckett, Donevant continued to miss work and he attempted to bring her attendance under control by issuing warnings, giving her a negative performance re-

view, and requiring her to tell him when she was not going to be in the office during normal operating hours.

On her first day back to work following her sick leave, Duckett stated he informed Donevant she was not to interfere with any decisions made by the City of Myrtle Beach during her absence. Specifically, he told her "whatever had been approved by Myrtle Beach was done, and that she needed to focus her attention when she came back on new things that were coming in." He informed her of this in writing and warned that termination might result if she interfered with any decisions made during her leave. Duckett also reminded Donevant that she was to report to him and not to Fellner. Duckett felt Donevant had been avoiding him—preferring to report to Fellner. Fellner testified she also told Donevant to report to Duckett and not to her.

Duckett stated he first learned of the stop-work order at the Pier Restaurant when a member of the town council called him asking what was going on there. About the same time, Fellner called Duckett to report her conversation with Donevant about the stop-work order. Duckett immediately went to the pier and, to his surprise, was greeted by a television crew and members of council. Duckett testified Donevant had exercised poor judgment by not telling him what was going on at the pier and not reporting to him as instructed. He stated that "if [he] had simply been told whenever [the stop-work order] was issued . . . that would have been fine." According to Duckett, he ultimately suspended Donevant for three days "due to her inability to follow directions."

Duckett testified that several weeks after Donevant returned from her suspension, a town election was held and a new mayor was elected. Duckett stated he did not want to continue in his position with the changes and decided he would resign. He also decided he did not think it was right to pass a "problem employee" to the next administrator, and he therefore decided to terminate Donevant.

## C. Directed Verdict/JNOV

The Town moved for a directed verdict, asserting that even if Donevant was fired for issuing the stop-work order at the Pier Restaurant, it would not constitute a discharge in viola-

tion of public policy because that cause of action "has not been expanded beyond situations in which the employer requires the employee to violate a criminal law or where the reason for the employee's termination is itself a violation of criminal law...." The Town also argued a directed verdict should be granted because under *Antley v. Shepherd*,[2] a government employee fired for exercising discretionary authority cannot assert a claim for public policy discharge. On the other hand, Donevant argued *Antley* was inapplicable because she was required by law—specifically, the building code as adopted by the Town—to issue a stop-work order when she saw unpermitted construction ongoing at the Pier Restaurant.

After taking the matter under advisement, the trial court denied the Town's motion for directed verdict and later denied the Town's motion for judgment notwithstanding the verdict (JNOV). The trial court concluded that whether Duckett instructed Donevant not to issue a stop-work order at the Pier Restaurant was a question of fact for the jury. The trial court determined there was evidence Donevant was fired in retaliation for issuing the stop-work order at the Pier Restaurant and that such a discharge fell within the public policy exception to at-will employment.

In the directed verdict stage, the trial court stated it was not expanding the public policy exception to at-will employment and that Donevant's claim "comes clearly within what our courts have already articulated what the law is"—that "she was required by her employer to violate the law." In the JNOV stage, however, the court explained there was evidence

> [Donevant] was instructed not to issue anything ... that would interfere with what was going on at the pier, which dealt with her responsibilities as a building official. In her estimation, being told not to enforce the building code was instructing her to act contrary to public policy, and in addition to that, there is another layer to that which is [Duckett is] basically telling [her] to disregard the law, which the [T]own adopted in the nature of these International Building Codes, and to not do [her] job and not

---

2. 340 S.C. 541, 532 S.E.2d 294 (Ct.App.2000), *aff'd as modified by* 349 S.C. 600, 564 S.E.2d 116 (2002).

enforce the law, which is arguably a violation of public policy and [a] violation of the law.

Donevant's claim for retaliatory discharge went to the jury with the only issue tried being whether the Town fired Donevant in violation of public policy because she issued a stop-work order on a construction project at the Pier Restaurant. The jury returned a verdict in favor of Donevant in the amount of $500,000, which was later reduced to $300,000 pursuant to the South Carolina Tort Claims Act. This appeal followed.

## STANDARD OF REVIEW

▮▮▮ "The appellate court will reverse the trial court's ruling on a directed verdict motion only when there is no evidence to support the ruling or where the ruling is controlled by an error of law." *Jones v. Lott,* 379 S.C. 285, 288–89, 665 S.E.2d 642, 644 (Ct.App.2008), *aff'd by* 387 S.C. 339, 692 S.E.2d 900 (2010). "In ruling on a motion for directed verdict, the trial court must view the evidence and the inferences which reasonably can be drawn therefrom in the light most favorable to the party opposing the motion." *Erickson v. Jones St. Publishers, L.L.C.,* 368 S.C. 444, 463, 629 S.E.2d 653, 663 (2006). "The trial court must deny the motion when either the evidence yields more than one inference or its inference is in doubt." *Id.* "When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence." *Id.* "The appellate court must determine whether a verdict for a party opposing the motion would be reasonably possible under the facts as liberally construed in his favor." *Id.* "If the evidence is susceptible to more than one reasonable inference, the case should be submitted to the jury." *Id.*

## LAW/ANALYSIS

### I. Expansion of Public Policy Exception

The Town first argues that by denying its motion for a directed verdict, the trial court erred in expanding the public policy exception to at-will employment beyond situations where the employer (1) requires the employee to violate criminal law or (2) the reason for the employee's termination

itself is a violation of criminal law. The Town asserts that although the public policy exception has not been expressly limited to these two situations, it has not been "applied beyond them." According to the Town, Donevant's claim that she was fired for issuing a stop-work order at the Pier Restaurant does not fall under the public policy exception as applied by our courts because the building code merely "authorizes" Donevant, as building official, to issue stop-work orders but does not subject her to *criminal* punishment for failing to do so. We disagree.

"In South Carolina, an at-will employee may be terminated for any reason or no reason at all." *McNeil v. S.C. Dep't of Corr.*, 404 S.C. 186, 195, 743 S.E.2d 843, 848 (Ct.App. 2013) (Lockemy, J., concurring in part and dissenting in part). "Under the public policy exception to the at-will employment doctrine, however, an at-will employee has a cause of action in tort for wrongful termination where there is a retaliatory termination of the at-will employee in violation of a clear mandate of public policy." *Barron v. Labor Finders of S.C.*, 393 S.C. 609, 614, 713 S.E.2d 634, 636–37 (2011) (internal quotation marks omitted). "The public policy exception clearly applies in cases where either: (1) the employer requires the employee to violate the law ... or (2) the reason for the employee's termination itself is a violation of criminal law." *Id.* at 614, 713 S.E.2d at 637 (citation omitted). "While the public policy exception applies to situations where an employer requires an employee to violate the law or the reason for the termination itself is a violation of criminal law, the public policy exception is not limited to these situations." *Id.* Thus, "an at-will employee may have a cause of action for wrongful termination even if the discharge itself did not violate criminal law or the employer did not require the employee to violate the law." *Id.* at 614–15, 713 S.E.2d at 637. The public policy exception, however, "has not yet been extended beyond [these two situations]." *McNeil*, 404 S.C. at 192, 743 S.E.2d at 846; *see also Taghivand v. Rite Aid Corp.*, 411 S.C. 240, 243, 768 S.E.2d 385, 387 (2015) ("While we have made clear that the exception is not limited to these situations, we have specifically recognized no others." (internal quotation marks omitted)).

The trial court did not err in denying the Town's directed verdict motion on this ground. Initially, we find it helpful to identify the scope of the Town's appeal. In her complaint, Donevant alleged the Town fired her in retaliation for issuing a stop-work order at the Pier Restaurant. The jury awarded Donevant damages based on her complaint. At oral argument, the Town conceded that the reason Donevant was fired is not an issue on appeal. Consequently, the Town's arguments are all questions of law. It first asserts Donevant's claim for discharge in violation of public policy fails as a matter of law because she was not subject to criminal punishment for not issuing a stop-work order. We do not believe the public policy exception to at-will employment requires a criminal punishment. The plain language of our supreme court's decision in *Barron* states an action for retaliatory discharge applies when "the employer requires the employee to violate *the law*...." 393 S.C. at 614, 713 S.E.2d at 637 (emphasis added). Nothing in *Barron* or later decisions by our supreme court hold the employer must require the employee to violate a criminal law in order for the public policy exception to apply. *See id.; Taghivand*, 411 S.C. at 243, 768 S.E.2d at 387 (stating the public policy exception to at-will employment applies when "an employer requires an employee, as a condition of continued employment, to break *the law*" (emphasis added)). Thus, even if Donevant violated a law that only carried a civil penalty, it would not be fatal to her claim for retaliatory discharge.

Next, the Town asserts the trial court erred in not granting a directed verdict because the public policy exception has not been *applied* beyond situations where (1) the employer requires the employee to violate criminal law or (2) the reason for the employee's termination itself is a violation of criminal law. The Town's argument fails because *Barron* holds the public policy exception is not limited to these two situations. *See* 393 S.C. at 614, 713 S.E.2d at 637. In *Barron*, our supreme court specifically overruled our court to the extent we limited the public policy exception to these two situations. *See id.* at 615–16, 713 S.E.2d at 637 ("We find the court erred, however, in holding the exception is limited to these situations where our courts have explicitly held the public policy exception is not so limited. Accordingly, we overrule the Court of

Appeals' opinion to the extent it holds the public policy exception applies only in situations where the employer asks the employee to violate the law or the reason for the termination itself is a violation of criminal law." (citations omitted)). Although the public policy exception has not been applied outside the two situations described above, if we were to reverse the jury's verdict on this ground, we would effectively be limiting the public policy exception to these two situations in direct contravention of our supreme court's holding in *Barron.* Moreover, as discussed below, Donevant's claim falls within the public policy exception to at-will employment as applied in this state because Duckett fired her for refusing to violate the law. Therefore, the trial court did not err in denying the Town's motion for a directed verdict on this ground.

## II. *Antley v. Shepherd*

The Town next argues that by denying its motion for a directed verdict, the trial court disregarded the rule from *Antley v. Shepherd* that the public policy exception "does not apply to terminations of employees who insist on performing an act that is discretionary, i.e., that the law does not require them to perform." We disagree.

In *Antley,* a county tax assessor refused to comply with a county administrator's order not to initiate an appeal from a decision by the board of assessment appeals. 340 S.C. at 545–46, 532 S.E.2d at 296. When the tax assessor refused to dismiss a pending appeal, the county administrator fired the tax assessor for not following his order. *Id.* at 546, 532 S.E.2d at 296. The tax assessor filed a claim for wrongful termination against the county, alleging she, as tax assessor, maintained the statutory right to file appeals from decisions by the board of assessment appeals, and the directive that she not file any appeals from board decisions placed her "in a position of being required to disobey the law" as a condition of her employment. *Id.* She asserted this requirement constituted a public policy tort and her termination for refusing to follow the directive was unlawful. *Id.* In support of her argument that she had a right to file appeals, the tax assessor relied on sections 12–37–90 and 12–60–2540 of the South Carolina Code (2014). *Id.* at 549, 532 S.E.2d at 298. Subsection 12–37–90(f)

states the tax assessor "is responsible for the operations of his office and shall . . . have the right of appeal from a disapproval of or modification of an appraisal made by him." Subsection 12–60–2540(A) provides that within thirty days of a decision by the board of assessment appeals, "a property taxpayer or county assessor may appeal a property tax assessment."

The county moved for summary judgment, claiming Antley was an at-will employee fired for cause. *Antley*, 340 S.C. at 546, 532 S.E.2d at 296. The trial court granted summary judgment to the county, finding that because the statutes permitted, rather than required, Antley to file appeals, the administrator's directive did not require her to violate the law. *Id.* Our court affirmed the trial court. *Id.* at 549, 532 S.E.2d at 298. We stated:

[S]ections 12–37–90 and 12–60–2540 gave Antley, as county tax assessor, the *right* to file appeals to the ALJD and established her status as a real party in interest in such appeals. These sections thus permitted, but did not require, Antley to appeal adverse board decisions. Moreover, nothing in sections 12–37–90 or 12–60–2540 gave Antley the sole discretion in determining which cases to appeal. If the General Assembly had intended the assessor's right of appeal to be unfettered by the county administrator or county council, it certainly could have provided that the decision of whether or not to appeal a board's determination is solely that of the assessor.

*Id.*

We read *Antley*'s holding that summary judgment was proper on the tax assessor's claim for retaliatory discharge in violation of public policy as based on three grounds: (1) Antley had the statutory right to file appeals, but was not required to do so; (2) the statutes she relied on for her authority did not give her the sole discretion to determine which cases to appeal; and (3) the General Assembly had not provided that the assessor's right of appeal was unfettered; therefore, nothing prevented the county from adopting a policy that defined the cases to be appealed. Our review of these grounds indicates *Antley* is distinguishable from this case.

We first address whether Donevant had sole discretion to decide whether to issue a stop-work order for violations of the

building code. Unlike *Antley* where the tax assessor or "a property taxpayer" could appeal a property tax assessment, Donevant claims "[t]he building code does not grant any other individual any discretion or any right to make the determination of whether to issue a stop work order." The Town argues "the scope of her authority is a legal question ... for the court to decide"; however, it does not cite any authority that gives another party authority to issue a stop-work order. Based on our review of the building code, the building official is the only party authorized to issue a stop-work order for code violations. Thus, Donevant had sole discretion to determine whether to issue a stop-work order.

We next address whether Donevant was required by law to issue a stop-work order. The Town points out Donevant's authority came from a building code provision that states "[w]henever the building official finds any work regulated by this code being performed in a manner either contrary to the provisions of this code or dangerous or unsafe, the building official *is authorized* to issue a stop work order." (emphasis added). Similar to *Antley*'s "right" of appeal, at first glance it appears Donevant was permitted but not required to issue a stop-work order for building code violations. After considering other statutory and building code provisions in light of the facts in this case, we believe that unlike the tax assessor in *Antley,* the law required Donevant to take action to enforce compliance with the building code when she saw unpermitted construction at the Pier Restaurant.

Subsection 6–9–10(A) of the South Carolina Code (Supp. 2014) states:

All municipalities ... and counties in this State *shall enforce* ... building codes in this chapter, relating to the construction, livability, sanitation, erection, energy efficiency, installation of equipment, alteration, repair, occupancy, classification, or removal of structures located within their jurisdictions and *promulgate regulations to implement their enforcement.*

(emphasis added).

Section 6–9–30 of the South Carolina Code (Supp.2014) requires all municipalities and counties to appoint a building official or contract for a building official within the municipal

limits. Pursuant to subsection 6-9-50(A) of the South Carolina Code (Supp. 2014), the International Building Code (IBC), with the exception of Chapter One, is adopted in every municipality or county in the State. The Town adopted Chapter One of the IBC by passing an ordinance. Thus, Chapter One of the IBC, which provides for certain duties and responsibilities for the building official, applies within the Town's jurisdiction.

Under Chapter One of the IBC, "[t]he building official is hereby authorized and directed to enforce the provisions of this code." Int'l Bldg. Code § 104.1 (2012). "The building official shall . . . issue permits for the erection, and alteration, demolition and moving of buildings and structures, inspect the premises for which such permits have been issued and enforce compliance with the provisions of the code." Int'l Bldg. Code § 104.2 (2012). "The building official shall issue all necessary notices or orders to ensure compliance with this code." Int'l Bldg. Code § 104.3 (2012). Section 105.1 of the IBC (2012) provides:

> Any owner or authorized agent who intends to construct, enlarge, alter, repair, move, demolish, or change the occupancy of a building or structure, or to erect, install, enlarge, alter, repair, remove, convert or replace any electrical, gas, mechanical or plumbing system, the installation of which is regulated by this code, or to cause any such work to be done, shall first make application to the building official and obtain the required permit.

In addition, it is unlawful "for any person, firm or corporation to erect, construct, alter, extend, repair, move, remove, demolish or occupy any building, structure or equipment regulated by this code, or cause same to be done, in conflict with or in violation of any of the provisions of this code." Int'l Bldg. Code § 113.1 (2012).

First, it is undisputed the contractors at the Pier Restaurant had not obtained a construction permit when Donevant issued the stop-work order. The contractors only had a demolition permit that allowed for "demo interior of building only." *See* § 105.1 ("Any owner or authorized agent who intends to construct . . . shall first make application to the building official *and obtain the required permit.*" (emphasis

added)). Furthermore, Donevant testified the contractors had started construction by cutting openings for doors and windows; studding a new wall; and installing plumbing, electrical, and subflooring. Because the contractors had started construction without the required permit, the construction was unlawful under the building code. *See* § 113.1.

Because the construction at the Pier Restaurant violated the building code, the law required Donevant, as building official, to take action to enforce compliance with the code. *See* § 104.2 (stating "[t]he building official *shall* . . . issue permits for the erection, and alteration, demolition and moving of buildings and structures, inspect the premises for which such permits have been issued *and enforce compliance with the provisions of the code* " (emphasis added)). In order to carry out her legal duty to "enforce compliance" with the building code, Donevant issued a stop-work order as she was required to do by law. *See* § 104.3 (stating "[t]he building official shall issue all necessary notices or orders to ensure compliance with this code"). Thus, unlike *Antley,* where the statutes "permitted but did not require" the tax assessor to take action, the statutory and building code provisions at issue here *required* Donevant's actions of enforcing compliance with the building code.

We agree with the trial court that Donevant's claim "comes clearly within what our courts have already articulated what the law is"—that "she was required by her employer to violate the law." By instructing Donevant not to "change, ameliorate, or in any other manner amend any action that was taken during her absence[,]" Duckett was requiring Donevant not to perform her legal duty as a building official to enforce compliance with the building code. If Donevant had followed Duckett's directive and not taken action in response to the unlawful construction at the Pier Restaurant, she could have been charged with misconduct in office for failing to discharge this legal duty. *See State v. Hess,* 279 S.C. 14, 20, 301 S.E.2d 547, 550 (1983) (recognizing "[m]isconduct in office occurs *when duties imposed by law* have not been properly and faithfully discharged" (emphasis added)). By suspending Donevant and ultimately terminating her for issuing the stop-work order at the Pier Restaurant, Duckett effectively discharged Donevant for refusing to violate the law. Accordingly, Donevant's claim

for retaliatory discharge falls within a recognized exception to the doctrine of at-will employment in this state because she was required by her employer, "as a condition of continued employment, to break the law." *Taghivand,* 411 S.C. at 243, 768 S.E.2d at 387; *see also Barron,* 393 S.C. at 614, 713 S.E.2d at 637.

Notwithstanding the fact that Donevant was fired for refusing to violate the law, she also presented a cognizable claim that she was terminated "in violation of a clear mandate of public policy." *Barron,* 393 S.C. at 614, 713 S.E.2d at 637 (stating "[a]n at-will employee has a cause of action in tort for wrongful termination where there is a retaliatory termination of the at-will employee in violation of a clear mandate of public policy" (internal quotation marks omitted)).

In *Barron,* our supreme court explained that "[w]hile the public policy exception applies to situations where an employer requires an employee to violate the law or the reason for the termination itself is a violation of criminal law, the public policy exception is not limited to these situations." *Id.* The court stated:

> The determination of what constitutes public policy is a question of law for the courts to decide. *See Citizens' Bank v. Heyward,* 135 S.C. 190, 133 S.E. 709, 713 (1925) ("The primary source of the declaration of public policy of the state is the General Assembly; the courts assume this prerogative only in the absence of legislative declaration."). It is not a function of the jury to determine questions of law such as what constitutes public policy. Rather, once a public policy is established, the jury would determine the factual question whether the employee's termination was in violation of that public policy.

*Id.* at 617, 713 S.E.2d at 638.

Thus, the *Barron* court recognized there could be situations where an employee was terminated in violation of public policy even if she was not required by her employer to violate the law or the reason for her termination was not a violation of criminal law. As our supreme court explained in *Taghivand,* "any exception to [the doctrine of at-will employment,] which is itself firmly rooted in the public policy of this state, should emanate from the General Assembly, and from

this Court only when the legislature has not spoken." 411 S.C. at 248, 768 S.E.2d at 389. The determination of what constitutes public policy for purposes of the public policy exception to at-will employment is a question of law for the court. *See Barron,* 393 S.C. at 617, 713 S.E.2d at 638. We defer to the General Assembly in making this determination and find the public policy exception applicable in this case.

Subsection 6–9–5(A) of the South Carolina Code (Supp. 2014) entitled, "Public policy for building codes," states:

The public policy of South Carolina is to maintain reasonable standards of construction in buildings and other structures in the State consistent with the public health, safety, and welfare of its citizens. To secure these purposes, a person performing building code enforcement must be certified by the South Carolina Building Codes Council, and this act is necessary to provide for certification.

To implement the policy of maintaining reasonable construction standards, the General Assembly has declared "[a]ll municipalities ... and counties in this State shall enforce ... building codes in this chapter, relating to the construction, livability, sanitation, erection, energy efficiency, installation of equipment, alteration, repair, occupancy, classification, or removal of structures located within their jurisdictions and promulgate regulations to implement their enforcement." S.C.Code Ann. § 6–9–10.

We believe the General Assembly's use of the words "[t]he public policy of South Carolina" and its mandate that all municipalities enforce the building code indicates a legislative intent to make enforcement of the building code a public policy of this state. It is difficult to imagine a more clear declaration of public policy than language stating "[t]he public policy of South Carolina *is* . . . ." (emphasis added). We cannot ignore the significance of such clear language in a statute. Here, Donevant was enforcing the building code and therefore enforcing a clear mandate of public policy when she issued the stop-work order for unpermitted construction at the Pier Restaurant. Duckett initially suspended her and ultimately terminated her for taking this action. The Town has not appealed the reason for Donevant's firing. Thus, Donevant

presented a cognizable claim that she was fired in violation of a clear mandate of public policy.

## CONCLUSION

Based on the foregoing, the trial court did not err in denying the Town's motion for a directed verdict. Therefore, the trial court is

**AFFIRMED.**

SHORT and MCDONALD, JJ., concur.