# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Denise Wright, Petitioner,

v.

PRG Real Estate Management, Inc., Franklin Pineridge Associates, Karen Campbell Individually and in her Representative Capacity as an Agent of PRG Real Estate Management, Respondents.

Appellate Case No. 2015-001921

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Richland County
W. Jeffrey Young, Circuit Court Judge

---

Opinion No. 27868
Heard March 6, 2018 – Filed March 20, 2019

---

### REVERSED

---

S. Randall Hood, Jordan C. Calloway, and Deborah G. Casey, all of McGowan, Hood & Felder, LLC, of Rock Hill, E. Wayne Ridgeway Jr., of Burriss Ridgeway, of Columbia and Gerald Malloy, of Malloy Law Firm, of Hartsville, for Petitioner.

Charles A. Kinney and Christian Stegmaier, both of Collins & Lacy, PC, of Columbia, for Respondents.

**JUSTICE JAMES:** Denise Wright was abducted and robbed at gunpoint by two unknown assailants in a common area of an apartment complex (Wellspring) in which she resided. Wellspring was owned by Respondent Franklin Pineridge Associates and operated by Respondent PRG Real Estate Management, Inc. Respondent Karen Campbell was Wellspring's property manager and an employee of PRG at the time of the incident. Wright sued Respondents for negligence, alleging Respondents voluntarily undertook a duty to provide security to residents of Wellspring and breached this duty, thereby causing her damages. She also alleged Respondents were negligent in failing to properly maintain shrubbery and lighting on the premises. The circuit court granted summary judgment to Respondents on Wright's negligence claim. A divided court of appeals affirmed. *Wright v. PRG Real Estate Mgmt., Inc.*, 413 S.C. 276, 775 S.E.2d 399 (Ct. App. 2015).

We granted Wright's petition for a writ of certiorari to review the following questions: (1) whether Respondents voluntarily undertook a duty to provide security services to residents, (2) if such a duty exits under the facts of this case, whether there is a genuine issue of material fact that Respondents breached the duty, and (3) whether there is a genuine issue of material fact that any such breach proximately caused Wright's damages. We reverse the court of appeals and remand the matter to the circuit court for trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2003, Wright began her search for an apartment she could rent in the Columbia area. Wellspring is part of a planned unit development known as the "Harbison Community Association," and several walking trails weave throughout the community. Wellspring and other properties within the community are accessible via these public trails. Wright testified she initially became interested in Wellspring because of its proximity to her job and because of several recommendations from members of her church. Wright testified security was an important factor in her decision-making process. She testified that at the time she signed her lease, a Wellspring manager told her there were security officers on duty. During oral argument at the court of appeals, Respondents conceded Wright "was told that there are security officers" and that when Wright moved into the complex, she had that expectation. Wright testified this representation caused her to believe Wellspring would be a safe place in which to live. Wright leased an apartment at Wellspring from 2003 until the subject incident occurred in 2008.

An internal Wellspring employee manual stated, "We generally do not provide security for our residents[,] and employees should never indicate that we do so." This information was not given to residents. Wellspring had designed a courtesy officer program allowing residents affiliated with law enforcement to receive reduced rent in exchange for their service as courtesy officers for the apartment complex. Wellspring employed these courtesy officers as independent contractors and entered into agreements requiring the courtesy officers to (1) spend a minimum of two hours daily of their off-duty time walking the property, (2) answer calls regarding incidents on the property, and (3) submit daily reports to the property manager. Courtesy officers were asked not to carry a weapon unless required by their law enforcement employer. Courtesy officers were asked, but were not required, to park their law enforcement vehicles on the Wellspring premises. The parameters of these agreements were kept internally and were not provided to residents. Wellspring published a "security pager" number in a monthly tenant newsletter. The newsletter also prominently noted "[s]ecurity is also [a] very top priority with us" and advised tenants to "call the security pager or Richland County Sheriff Dept. if you see anything suspicious." Respondents did not alert Wright or other tenants that the provision of "security" was limited to the confines of the courtesy officer program, as those particulars were known only to Respondents.

Also, Respondents contracted with a maintenance company to provide landscaping services at Wellspring, including the trimming and shaping of shrubs as needed. Respondents also provided lighting in the common areas and parking lots of Wellspring.

On the night of September 18, 2008, Wright left choir practice at her nearby church and returned to Wellspring at approximately 10:00 p.m. Wright parked her car and began walking toward the ramp that led to her apartment. She testified, "The pole light in the parking lot was not illuminated and the view of the stairs and ramp . . . was obscured by darkness and massive shrubbery that was overgrown." Before Wright could reach her apartment, two armed men appeared from behind the shrubbery and demanded money. When Wright replied she was not carrying any cash, the men forced her at gunpoint to drive them to several ATMs to withdraw money from her account. The men promised Wright they would kill her and told her, "You will never see home again." One of the men put his hand down the back of Wright's pants and contemplated "hav[ing] some fun before [killing] her." Eventually, the men fled Wright's car and escaped. Wright sped away and drove to her daughter's house where law enforcement interviewed her.

The next day, Wright met with a representative of Wellspring. Wright testified the first thing she asked the manager was, "Where are these security officers

that are supposed to be walking the beat? I didn't see anybody. There was nobody there when I needed them. I didn't see one. I've never seen one the whole time I've lived there." Wright testified the manager shrugged her shoulders and replied, "I'm sorry." Wright did not spend another night in her apartment at Wellspring and moved out a few days later. Unfortunately, the two assailants have never been identified.

There were no courtesy officers at Wellspring on the night Wright was abducted and robbed in September 2008; the last time a courtesy officer had been employed at Wellspring was in July 2008. Respondent Karen Campbell, the property manager at the time of the incident, testified there were periods of time when there were no courtesy officers because officers would leave Wellspring or quit the program for various reasons. Although there were no courtesy officers at the time of the incident, Wellspring continued to publish the security pager number in its monthly tenant newsletter. Respondents were not sure who, if anyone, would have answered the security pager when no courtesy officers were employed. There is no evidence Respondents ever informed Wright and other tenants that the security program lacked its key ingredient—the participation of security officers.

Wright's security expert, William F. Booth, stated four opinions in his deposition. First, Booth opined that Wellspring is a unique property because it is an apartment complex wrapped around a public park. He believed this fact placed an additional responsibility on Respondents to provide security for its residents, which was not met. He testified the incident was foreseeable due to the lack of security. Second, Booth opined that the shrubbery on the property had become overgrown and provided a hiding place for the individuals who committed the crime. He testified the incident would have been avoided if the shrubbery had been cut to an appropriate height. Third, Booth opined the lighting on the property was below industry standards, and if the lighting had been adequate, the crime would not have occurred. Fourth, Booth opined that Wellspring represented to its residents that there was security in place pursuant to the courtesy officer program and that it was reasonable for residents to have relied on the courtesy officers to patrol the property. He testified that "had the courtesy officers been there and been patrolling the property as required that the perpetrators in this crime more likely than not would not have been in the position to rob and kidnap [Wright]."

Wright brought this action against Respondents for negligence, breach of implied warranties, and violation of the South Carolina Unfair Trade Practices Act.[1]

---

[1] S.C. Code Ann. §§ 39-5-10 to -180 (1976 & Supp. 2018).

Wright's negligence claim is the only cause of action relevant to the instant appeal. Wright alleged Respondents were negligent in failing to protect tenants from third-party criminal activity by not (1) providing adequate lighting in the common areas, (2) maintaining the overgrown shrubbery to an appropriate height, and (3) executing its courtesy officer program in a reasonable manner. Respondents argue they did not owe Wright a duty to provide security. They further argue that even if they did, they breached no duty. Finally, they argue that even if they breached a duty owed to Wright, their alleged negligence was not a proximate cause of any harm sustained by Wright. The circuit court granted Respondents' motion for summary judgment.

A divided court of appeals affirmed. *Wright v. PRG Real Estate Mgmt., Inc.*, 413 S.C. 276, 775 S.E.2d 399 (Ct. App. 2015). As to Wright's negligence action, the majority held Respondents had no duty to protect Wright from third-party criminal activity. The majority rejected Wright's argument that the relevant facts of her case created an exception to the general rule that landlords do not have a duty to provide security services and protect tenants from criminal activity arising from the (1) particular circumstances, (2) common areas exception, and (3) affirmative acts exception.

In its discussion of the affirmative acts exception, the majority addressed Wright's argument that a duty arose from Respondents' (1) hiring courtesy officers to patrol the premises, (2) providing common area lighting, and (3) trimming the shrubbery throughout the common area. The majority found the creation of the courtesy officer program did not impose on Respondents a duty to exercise reasonable care in providing security at Wellspring; the majority held Respondents' undertaking to create the courtesy officer program required only that Respondents maintain the program itself with reasonable care. The majority explained, "Under the facts of this case, the duty [R]espondents assumed was limited to exercising reasonable care in maintaining the courtesy officer program, and [there is] no evidence they failed to exercise reasonable care in fulfilling that duty." *Wright*, 413 S.C. at 288, 775 S.E.2d at 406. Citing the reasoning in *Cramer v. Balcor Property Management, Inc.*, 848 F. Supp. 1222 (D.S.C. 1994), the majority found the situation "indistinguishable" because the "fact that the courtesy officer position was vacant at the time is a circumstance too attenuated from the kidnapping and robbery of Wright to establish a duty to provide security." *Wright*, 413 S.C. at 288, 775 S.E.2d at 406. The majority also found Respondents' provision of lighting and maintenance of shrubbery did not give rise to a duty to provide security. The majority did not employ section 323 of the Restatement (Second) of Torts (1965) in reaching its conclusions, nor did the majority address Wright's contention that she was not advised of the limitations of the security program.

Concurring in part and dissenting in part, then-Judge Lockemy disagreed with the majority's conclusion that summary judgment should have been granted on Wright's claim that Respondents were negligent in failing to provide security as represented to Wright. Applying section 323 of the Restatement (Second) of Torts (1965), Judge Lockemy concluded Wright presented some evidence that she expected security and that Respondents undertook the duty to provide it. Judge Lockemy wrote that by specifically informing Wright that "the complex had 'security officers' and urging tenants to call the security pager in the event of an emergency, Wellspring undertook a duty to either provide security at the complex, or to take affirmative steps to ensure tenants were aware of the limitations of its security program." *Wright*, 413 S.C. at 293, 775 S.E.2d at 408 (Lockemy, J., concurring in part and dissenting in part).

Judge Lockemy also concluded the majority's reliance on *Cramer v. Balcor Property Management, Inc.*, 848 F. Supp. 1222 (D.S.C. 1994), which applied the affirmative acts exception, was misplaced. He noted the source of *Cramer's* authority for the affirmative acts exception was rooted in section 323. Judge Lockemy believed the instant situation to be more akin to the "undertaking" exception and stated "a tenant injured by a third party criminal attack at an apartment complex may be able to establish a duty owed by a landlord who has undertaken to provide security pursuant to section 323." *Wright*, 413 S.C. at 295, 775 S.E.2d at 409-10 (Lockemy, J., concurring in part and dissenting in part). Because Judge Lockemy found Wright presented evidence establishing a duty under section 323, he addressed Wright's proximate cause argument and concluded there were genuine issues of material fact that would allow Wright's negligence claim to survive summary judgment.

Wright filed a petition for a writ of certiorari with this Court. We granted Wright a writ of certiorari on the sole question of whether the court of appeals erred in failing to apply section 323 to Wright's allegation that Respondents voluntarily assumed a duty to provide security to her.

## II.  STANDARD OF REVIEW

"The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder." *George v. Fabri*, 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001). "When reviewing a grant of summary judgment, appellate courts apply the same standard applied by the trial court pursuant to Rule 56(c), SCRCP." *Turner v. Milliman*, 392 S.C. 116, 121-22, 708 S.E.2d 766, 769 (2011). Rule 56(c), SCRCP, provides a circuit court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." "On summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *George*, 345 S.C. at 452, 548 S.E.2d at 874. When a circuit court grants summary judgment on a question of law, this Court will review the ruling de novo. *Town of Summerville v. City of N. Charleston*, 378 S.C. 107, 109-10, 662 S.E.2d 40, 41 (2008).

## III. DISCUSSION

Wright argues the court of appeals erred in failing to apply section 323 of the Restatement (Second) of Torts to her negligence action. Wright asserts section 323 "stands on its own doctrinal footing and may not be narrowed or ignored when considering a residential landlord's voluntarily assumed security program."

### A. Voluntarily Assumed Duties in South Carolina

In an action alleging negligence, a plaintiff must show (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached the duty by a negligent act or omission, (3) the defendant's breach was an actual and proximate cause of the plaintiff's injury, and (4) the plaintiff suffered injury or damages. *Dorrell v. S.C. Dep't of Transp.*, 361 S.C. 312, 318, 605 S.E.2d 12, 15 (2004). "If there is no duty, then the defendant in a negligence action is entitled to a judgment as a matter of law." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 135-36, 638 S.E.2d 650, 656 (2006).

"While there is generally no duty to act under the common law, a duty to use due care may arise where an act is voluntarily undertaken." *Vaughan v. Town of Lyman*, 370 S.C. 436, 446, 635 S.E.2d 631, 637 (2006). "The question of whether such a duty arises in a given case may depend on the existence of particular facts. Where there are factual issues regarding whether the defendant was in fact a volunteer, the existence of a duty becomes a mixed question of law and fact to be resolved by the fact finder." *Id.* at 446-47, 635 S.E.2d at 637 (quoting *Miller v. City of Camden*, 329 S.C. 310, 314, 494 S.E.2d 813, 815 (1997)). Although a landlord generally has no duty to provide security to protect tenants from criminal acts of third parties, a landlord who undertakes to provide security measures may be liable if the undertaking is performed negligently. *See* Tracy A. Bateman & Susan Thomas, Annotation, *Landlord's Liability for Failure to Protect Tenant from Criminal Acts of Third Person*, 43 A.L.R. 5th 207 (1996). The landlord's duty can be limited and will apply only to the extent of the landlord's undertaking. *Id.*

The recognition of a voluntarily assumed duty in South Carolina jurisprudence is rooted in section 323 of the Restatement (Second) of Torts (1965),[2] which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Under section 323, the voluntary undertaking does not create a duty of care unless (a) the undertaker's failure to exercise reasonable care in performing the undertaking increased the risk of harm to the plaintiff, or (b) the plaintiff suffered harm because she relied upon the undertaking. State and federal case law in South Carolina have not been clear as to whether section 323 applies to a landlord's voluntarily assumed duty to provide security to a tenant.

It is well-settled in South Carolina that a landlord generally does not owe an affirmative duty to a tenant to provide security in and around leased premises to protect the tenant from the criminal activity of third parties. *See Cramer v. Balcor Prop. Mgmt., Inc.*, 312 S.C. 440, 444, 441 S.E.2d 317, 319 (1994) (*Cramer I*). In

---

[2] *See, e.g.*, *Roundtree Villas Ass'n, Inc. v. 4701 Kings Corp.*, 282 S.C. 415, 423, 321 S.E.2d 46, 51 (1984) (holding a common law duty of care arose under section 323 when a lender undertook to market condominium units and to repair defects in those units); *Sherer v. James*, 290 S.C. 404, 407-08, 351 S.E.2d 148, 150 (1986) ("Section 323(a) simply establishes a duty on one who undertakes to render services for the protection of another *to use due care* to avoid increasing the risk of harm. We agree with this rationale." (internal citation omitted)); *Madison ex rel. Bryant*, 371 S.C. at 136-37, 638 S.E.2d at 657 (recognizing a private treatment center may owe a duty to a patient under section 323); *Doe 2 v. Citadel*, 421 S.C. 140, 146-47, 805 S.E.2d 578, 581-82 (Ct. App. 2017) (applying section 323 in analyzing whether the defendant established a duty of care to the plaintiff when it voluntarily undertook to investigate claims of sexual abuse).

*Cramer I*, we explained that although South Carolina law does not impose a duty on a landlord to provide security to protect a tenant from the criminal acts of third parties, a plaintiff is not precluded from asserting a claim under a general negligence principle. *Id.* at 443 n.1, 441 S.E.2d at 319 n.1.

In *Cooke v. Allstate Management Corp.*, the United States District Court for the District of South Carolina enumerated four exceptions to the general rule: (1) the affirmative acts exception, (2) the concealed danger exception, (3) the common area exception, and (4) the undertaking exception. 741 F. Supp. 1205, 1209 (D.S.C. 1990). In *Cooke*, the plaintiff tenant brought a negligence action against her landlord seeking to recover damages after she was assaulted by an intruder who gained access to her second-floor apartment. She claimed the intruder gained access to her apartment by using a ladder that was negligently left on the premises by her landlord. *Id.* at 1206. The district court disagreed with the tenant's argument that the undertaking exception applied because of an inadequate lock and advice she received from the landlord regarding safety. In addressing the affirmative acts exception, the district court quoted *Crowley v. Spivey*, 285 S.C. 397, 406, 329 S.E.2d 774, 780 (Ct. App. 1985), for the proposition that "one who assumes to act, even though under no obligation to do so, may become subject to the duty to act with due care." *Cooke*, 741 F. Supp. at 1209-10. Because there was a factual issue as to whether the ladder was used by the intruder to enter tenant's apartment, and because there was some evidence the ladder was left unsecured by the landlord, the district court denied the landlord's motion for summary judgment pursuant to the affirmative acts exception. *Id.* at 1210. The district court did not directly cite section 323.

In *Cramer v. Balcor Property Management, Inc.* (*Cramer II*), the United States District Court for the District of South Carolina applied this Court's answer to a certified question in *Cramer I* to a plaintiff tenant's wrongful death action alleging negligence on behalf of the landlord after the deceased was murdered in her apartment. 848 F. Supp. 1222 (D.S.C. 1994). Although this Court ruled in *Cramer I* that there was no general duty under South Carolina law for the landlord to provide security, the district court addressed the affirmative acts exception and the undertaking exception. The district court defined the affirmative acts exception by quoting *Crowley*—"one who assumes to act, even though under no obligation to do so, may become subject to the duty to act with due care." *Cramer II*, 848 F. Supp. at 1224. The district court noted:

> [Plaintiff] argues that by initially hiring a "courtesy officer" to patrol the grounds and then terminating that officer without replacing him, [landlord] breached this duty. [Plaintiff] misapprehends the scope of the

affirmative acts exception. The exception envisions a situation where the act of the landlord leads directly to the injury complained of. The cases which fit this exception are those where there is a stronger connection between the act and the injury, such as where a landlord leaves an apartment door unlocked and a third party enters.

*Id.* In addressing the undertaking exception, the district court stated that "if a landlord undertakes to make repairs, they must be performed with due care." *Id.* The court found the landlord did not undertake to install any additional security devices on the apartment's sliding glass door; therefore, the landlord was not negligent. The court noted, "In order to fall within the undertaking exception, the defendant must undertake to do something." *Id.* at 1225. Because plaintiff's claim of negligence did not fit into any exception, the court granted the landlord's motion for summary judgment. There was no direct citation to section 323 by the district court.

In *Goode v. St. Stephens United Methodist Church*, a social guest of a tenant at an apartment complex was assaulted by third persons while at the complex and sued the landlord for negligence in failing to provide security. 329 S.C. 433, 494 S.E.2d 827 (Ct. App. 1997). The guest alleged a duty was created because the landlord undertook to render security services on the premises. In support of his argument, the plaintiff relied upon both the common law undertaking exception and section 323. The court of appeals addressed this argument as the "Duty Created by Undertaking." *Id.* at 444, 494 S.E.2d at 832. The court of appeals found (1) the security measures undertaken by the landlord (repairing locks, securing windows, informing tenants of criminal acts occurring in the complex, and routinely inspecting the complex) were for the residents of the complex and not the general public, (2) there was no evidence the security measures were performed with less than due care, and (3) there was no evidence any reliance on security by the tenants caused the plaintiff to be assaulted. *Id.* at 444-45, 494 S.E.2d at 833. Therefore, the court of appeals held there was no basis for liability to the non-tenant plaintiff under either the common law rule or section 323.

In Wright's brief before the court of appeals, she acknowledged, "South Carolina case law is not clear as to how the 'affirmative acts' exception differs from the 'undertaking exception.'" Nevertheless, Wright maintained that section 323 gave rise to her negligence cause of action. The court of appeals analyzed Wright's negligence cause of action under the affirmative acts exception without mention of section 323. We disagree with the court of appeals' approach and find Wright's

negligence cause of action invokes the undertaking exception—making section 323 applicable.

The affirmative acts exception is limited to situations where the landlord's direct action increases a tenant's risk of harm from criminal activities. Examples of such direct action may include a landlord giving out a master key to someone who should not have one, a landlord leaving an apartment door or window unlocked, or a landlord failing to secure a ladder that is used by a criminal to commit a crime. Such affirmative acts by the landlord may impose liability for criminal acts of third parties. On the other hand, the voluntary undertaking exception invokes section 323 and may be applicable when a landlord's actions are more attenuated. *See* Restatement (Second) of Torts § 323 (1965) ("One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."). Section 323 is the standard in South Carolina when analyzing voluntarily assumed duties. The concept of the undertaking exception is not limited to a landlord's undertaking to make repairs. Insofar as *Cooke* or *Cramer II* can be read to provide this limitation, we clarify the law in South Carolina. Here, Wright's argument that Respondents were negligent in failing to provide security invokes the undertaking exception.

## B. Analysis of Wright's Negligence Claim

Wright argues the court of appeals erred in affirming the circuit court's grant of summary judgment to Respondents on her claim that Respondents were negligent in failing to provide security. We agree and hold that under the facts of this case, summary judgment should not have been granted.[3]

---

[3] The court of appeals correctly found summary judgment was appropriate in the limited context of Respondents' actions involving the lighting and shrubbery at Wellspring. These actions do not give rise to a duty to provide security. The court of appeals correctly ruled:

> We find neither the provision of lighting nor the trimming
> of shrubbery around the parking areas and apartment
> buildings, even if done in part for the purpose of making
> the premises more secure, gives rise to a duty to provide

## 1. Duty

As noted above, "While there is generally no duty to act under the common law, a duty to use due care may arise where an act is voluntarily undertaken." *Vaughan*, 370 S.C. at 446, 635 S.E.2d at 637. "The question of whether such a duty arises in a given case may depend on the existence of particular facts. Where there are factual issues regarding whether the defendant was in fact a volunteer, the existence of a duty becomes a mixed question of law and fact to be resolved by the fact finder." *Id.* at 446-47, 635 S.E.2d at 637 (quoting *Miller*, 329 S.C. at 314, 494 S.E.2d at 815). A landlord generally has no duty to provide security to protect tenants from criminal acts of third parties, but a landlord who voluntarily undertakes to provide security measures may be liable if he negligently performs the undertaking. *See* Tracy A. Bateman & Susan Thomas, Annotation, *Landlord's Liability for Failure to Protect Tenant from Criminal Acts of Third Person*, 43 A.L.R. 5th 207 (1996). The landlord's duty can be limited and will apply only to the extent of the undertaking. *Id.*

Wright acknowledges the general rule that a landlord does not have a duty to provide security for their tenants; however, Wright asserts Respondents voluntarily undertook such a duty. She asserts her claim meets all of the section 323 requirements: (1) Respondents voluntarily undertook to provide services to her; (2) Respondents should have recognized those services as necessary for her safety; (3)

<hr>

security. It is inconceivable that any apartment developer would not install lighting and shrubbery around the parking areas and apartment buildings of a complex. The installation of lighting and maintenance of shrubbery serve multiple purposes in addition to increasing security—such as preventing accidental injury and improving aesthetics. If the law recognized these activities as "undertakings" sufficient to impose on developers and apartment managers a duty of reasonable care to provide security services, the rule of *Cramer I* would be swallowed by the . . . exception.

*Wright*, 413 S.C. at 289, 775 S.E.2d at 406. We simply cannot find the existence of such a duty under the facts of this case. *See Madison ex rel. Bryant*, 371 S.C. at 135-36, 638 S.E.2d at 656 ("If there is no duty, then the defendant in a negligence action is entitled to a judgment as a matter of law.").

Wright suffered from physical harm because Respondents failed to exercise reasonable care in their undertaking; and (4) either Respondents' failure increased the risk of harm to Wright or Wright suffered harm because of her reliance upon the undertaking. As noted above, Respondents concede a former Wellspring manager told Wright in broad terms "that there are security officers" and that Wright had that expectation when she moved in. The monthly tenant newsletter announced "[s]ecurity is also [a] very top priority with us," and there is no evidence to suggest Respondents notified Wright or any other tenants of the actual limitations of the courtesy officer program.

The majority at the court of appeals analyzed the question of the existence of a duty solely within the limited parameters of the courtesy officer program, specifically noting the relatively limited time of patrols per officer per day and the occasional lack of courtesy officers. The court of appeals based its holding on what it perceived as a narrow undertaking and did not consider the uncontroverted evidence that Wright had no knowledge of the limitations of the courtesy officer program. The court of appeals concluded, "Under the facts of this case, the duty [R]espondents assumed was limited to exercising reasonable care in maintaining the courtesy officer program, and [there is] no evidence they failed to exercise reasonable care in fulfilling that duty." *Wright*, 413 S.C. at 288, 775 S.E.2d at 406. The court of appeals' focus was too narrow. Respondents recite numerous limitations upon the program in their brief, but Wright had absolutely no knowledge of these limitations. The limited scope of the courtesy officer program analyzed by the court of appeals and described in Respondents' brief was known only to Wellspring and its employees.

Since Wright had no knowledge of the true limitations upon the program, we must examine the question of the existence of a duty of care with a focus upon the undertaking as it was described to Wright. At first glance, it would appear that subsections 323(a) and (b) encompass not only the assumption of a duty but also the issues of breach and proximate cause. However, in *Sherer v. James*,[4] we quoted with approval the following from the Appellate Court of Illinois in *Curry v. Summer*: "Section 323(a) simply establishes a duty on one who undertakes to render services for the protection of another to use due care to avoid increasing the risk of harm." 483 N.E.2d 711, 717 (Ill. App. Ct. 1985). In *Sherer*, we concluded section 323(a) "applies only to duty and not proximate cause." 290 S.C. at 408, 351 S.E.2d at 150. Likewise, subsection (b) applies only to duty and not proximate cause.

---

[4] 290 S.C. 404, 407-08, 351 S.E.2d 148, 150 (1986).

Therefore, in order for a duty of care to arise under section 323(a) or (b), Wright must establish that (a) Respondents' failure to exercise due care in performing the undertaking increased the risk of harm to Wright or that (b) Wright suffered harm because of her reliance upon the undertaking.

We conclude there are questions of fact that a jury must resolve to ascertain whether a duty of care arose in this case. *See Vaughan*, 370 S.C. at 446-47, 635 S.E.2d at 637. As Respondents point out, there is evidence in the record that Wright chose Wellspring as her place of residence not because of security concerns, but because it was close to her place of employment and was recommended by fellow church-goers. However, the record also contains Wright's testimony that she chose Wellspring because "there were security officers on duty. So I felt like it would be a safe place." Respondents also point out that when Wright confronted the Wellspring representative the day after the incident, Wright exclaimed that she had not seen any security on the premises since she moved in five years prior. Thus, Respondents contend any reliance Wright may have placed upon the presence of security had completely dissipated by the time she was attacked. Respondents will certainly be free to introduce this and any other evidence relevant to the question of the existence of a duty, but in the end, the jury must resolve genuine issues of material fact.

The dissent insists we have taken the common existence of a security officer program and morphed that limited undertaking into "a sweeping duty to protect tenants from the unforeseen criminal acts of third parties." The dissent further claims our decision "disincentivizes apartment complexes from offering a security officer program at all." We respectfully disagree with both contentions. First, we again note that the court of appeals mistakenly confined its analysis to the limited undertaking of the courtesy officer program, while there is evidence that a broader undertaking was described to Wright. As we have emphasized, the question of the existence of a duty under section 323(a) or (b) should not be analyzed with an eye solely upon the more limited undertaking urged by Respondents, especially when the parameters of that limited undertaking were known only to complex employees. Second, we are not recognizing a duty that is not already recognized by section 323. We have emphasized that under *Cramer I*, a landlord generally does not owe an affirmative duty to a tenant to provide security in and around leased premises to protect the tenant from the criminal activity of third parties. That is still undoubtedly the law in South Carolina. In holding as we do on the existence of a duty under the narrow facts of this case, we have simply given form to the application of section 323(a) or (b) to a set of facts that may, in the view of the factfinder, warrant such an application. That is hardly a sweeping approach, and our holding is no less sweeping

than the content of section 323 itself. There is no authority for the proposition that section 323 does not and cannot apply to an apartment complex that voluntarily undertakes to provide security to residents. Third, to the dissent's contention that our holding will disincentivize apartment complexes from offering security officer programs at all, our holding does nothing of the sort. If anything, our holding should incentivize the apartment complex that has voluntarily undertaken to offer security officer programs to recognize it has undertaken a duty to administer the programs with due care. The complex would have the right to impose limitations upon the program or even discontinue the program; however, the complex would be incentivized to simply let its tenants know.

To close on this point, we hold that under the narrow facts of this case, a jury must resolve the unique factual questions pertinent to the existence of a duty under section 323. Specifically, a jury must determine (a) whether any failure by Respondents to exercise due care in performing the undertaking increased the risk of harm to Wright or (b) whether any harm suffered by Wright arose from her reliance upon Respondents' undertaking. If the jury answers "No" to both questions, Wright's cause of action fails. If the jury answers "Yes" to either question, the jury must proceed to the issues of breach and proximate cause.

## 2. Breach and Proximate Cause

In the summary judgment setting, we consider the evidence of a breach of duty in the light most favorable to the non-moving party and must determine whether the evidence and all reasonable inferences to be derived from the evidence create a genuine issue of material fact. Here, there is evidence that would allow a jury to reasonably conclude Respondents failed to use due care in carrying out any duty owed under subsections 323(a) or (b). When she visited Wellspring before signing a lease, Wright was informed by an apartment manager there were security officers on duty. There was no security at all at the time of the incident, and there had been no security for two months prior to the incident. A jury could conclude Respondents failed to exercise due care in having security officers available, or at least negligently failed to notify apartment tenants of the absence of officers and the true limitations of the courtesy officer program.

Should the jury determine Respondents breached a voluntarily undertaken duty, we conclude there would be a jury issue as to whether such a breach was a proximate cause of any damages sustained by Wright. "Negligence is not actionable unless it is a proximate cause of the injury." *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 88, 502 S.E.2d 78, 83 (1998). "Proximate cause requires proof of both causation in fact and legal cause." *Id.* "Causation in fact is proved by establishing

the injury would not have occurred 'but for' the defendant's negligence." *Id.* "Legal cause is proved by establishing foreseeability." *Id.* at 88-89, 502 S.E.2d at 83.

"The general rule of law is that when, between negligence and the occurrence of an injury, there intervenes a willful, malicious, and criminal act of a third person producing the injury, but that such was not intended by the negligent person and could not have been foreseen by him, the causal chain between the negligence and the accident is broken." *Stone v. Bethea*, 251 S.C. 157, 162, 161 S.E.2d 171, 173-74 (1968). "It is generally for the jury to determine whether the defendant's negligence was a concurring proximate cause of the plaintiff's injuries. Only when the evidence is susceptible of only one inference does proximate cause become a matter of law for the court." *Bishop*, 331 S.C. at 89, 502 S.E.2d at 83 (citation omitted).

Of course, Wright argues that Respondents' negligence proximately caused her losses. She presented documentary evidence and expert testimony in her attempt to illustrate Respondents' conduct was a direct and proximate cause of her damages. Wright contends the intervening criminal acts of her attackers do not absolve Respondents of liability under South Carolina law. Although the existence of proximate cause indeed may hang by a slender thread, it hangs nonetheless, and we conclude the question should be resolved by a jury.

Legal cause is established by showing foreseeability. Here, Wright presented evidence that Respondents' negligence in operating the security program was the legal cause of her injuries. A third-party criminal act cannot be deemed *completely* unforeseeable as a matter of law when the alleged breach was Respondents' failure to properly administer a program that guarded against these very happenings. *See Cody P. v. Bank of America, N.A.*, 395 S.C. 611, 622-23, 720 S.E.2d 473, 479 (Ct. App. 2011) (relying in part on the defendant's policies and procedures that were "designed to avoid fraud and loss situations" to find an injury by fraud was foreseeable). Additionally, Wright's security expert Booth opined that Wright's injuries were foreseeable based upon an analysis of other crimes at Wellspring, including other crimes in the Wellspring parking lot. For example, between 2007 and the first nine months of 2008, Booth documented fifteen parking lot offenses at Wellspring. Booth testified that in the same parking lot where Wright was abducted, there had been an attempted home invasion and an attempted burglary within the previous two years. There had also been a series of vehicle-related crimes over the same time frame that Booth referred to as "precursor crimes"—incidents that likely would have included crimes against a person had the car's owner been present. While Respondents presented evidence indicating the attack was not foreseeable, the

evidence as a whole yields more than one inference as to foreseeability.[5] *See Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 309 S.C. 313, 317, 422 S.E.2d 128, 131 (1992) ("[L]egal cause is ordinarily a question of fact for the jury. Only when the evidence is susceptible to only one inference does it become a matter of law for the court.").

Cause-in-fact is proved by establishing a plaintiff's injuries would not have occurred "but for" a defendant's negligence. There is evidence in the record that Respondents' negligence was a cause-in-fact of Wright's injuries. Since there was no operational security program, there were no officers patrolling Wellspring at all during the two months leading up to the incident. Booth calculated that even under the limited parameters of the courtesy officer program, a courtesy officer would have been able to patrol Wellspring's premises five to six times during a two hour period. Booth stated that "had the courtesy officers been there and had been patrolling the property as required that the perpetrators in this crime more likely than not would not have been in the position to rob and kidnap [Wright]." Wright was never told there were no courtesy officers on the property, and there is a reasonable inference to be derived from the evidence that having this knowledge would have affected her actions on the night of the incident. As noted above, the day after the attack, Wright exclaimed to the apartment manager that she had not seen a security officer during the entire five years she lived at Wellspring. While this statement is evidence Wright's actions were <u>not</u> affected by her assumption that security was present, the evidence as a whole would allow a jury to conclude Wright has established the existence of cause-in-fact.

We conclude Wright presented a genuine issue of material fact that Respondents' negligence, if any, in operating the security program was a proximate cause of her damages.[6]

## IV. CONCLUSION

We hold the court of appeals erred in affirming the circuit court's grant of summary judgment in favor of Respondents. In this case, the question of the existence of a duty involves, in part, genuine issues of material fact that must be resolved by a jury. Also, there are genuine issues of material fact as to whether

---

[5] For example, Respondents provided the testimony of two law enforcement officers who were familiar with the area surrounding Wellspring and characterized the crime rate as "average."

[6] Of course, Wright will have the burden of proving her damages as well.

Respondents breached any duty owed and as to whether any damages sustained by Wright were a proximate cause of such breach. Therefore, we **REVERSE** the court of appeals and remand the matter to the circuit court for further proceedings consistent with this opinion.

**BEATTY, C.J., HEARN, J., and Acting Justice Edgar W. Dickson, concur. KITTREDGE, J., dissenting in a separate opinion.**

**JUSTICE KITTREDGE**: Today, the majority takes the common existence of an apartment complex's security officer program and morphs that limited undertaking into a sweeping duty to protect tenants from the unforeseen criminal acts of third parties. Especially troubling is what I view as the majority giving Petitioner a pass on the element of proximate cause. While Section 323 of the Restatement (Second) of Torts (1965) may serve as the basis for imposing a limited duty on Respondents, I respectfully dissent because Petitioner has failed as a matter of law to present evidence sufficient to create a question of fact concerning proximate cause. I would affirm the court of appeals in result. *Wright v. PRG Real Estate Mgmt., Inc.*, 413 S.C. 276, 775 S.E.2d 399 (Ct. App. 2015).

First, I take no exception to the principle that one who undertakes a duty is liable for physical harm resulting from the failure to exercise reasonable care in the performance of the undertaking. The majority correctly rejects Petitioner's "failure to trim shrubbery" and "inadequate lighting" theories. That leaves Petitioner with the alleged "negligent" security officer program. Apartment complexes routinely utilize these so-called security officer programs, in which law enforcement officers serve as courtesy officers and provide a "police presence" at the complex in exchange for free or reduced rent.

"Under South Carolina law[,] a landlord does not owe a duty to a tenant to provide security in and around a leased premises to protect the tenant from criminal activity of third parties." *Cramer v. Balcor Prop. Mgmt., Inc.* (*Cramer I*), 312 S.C. 440, 443, 441 S.E.2d 317, 318 (1994) ("Absent agreement, the landlord cannot be expected to protect [his tenants] against the wiles of felonry . . . . The criminal can be expected anywhere, any time, and has been a risk of life for a long time." (quoting *Cooke v. Allstate Mgmt. Corp.*, 741 F. Supp. 1205, 1213 (D.S.C. 1990))). However, a tenant may sue his landlord for the failure to protect him from crimes committed by third parties when the landlord voluntarily assumes a duty to protect the tenant and the landlord's negligence in carrying out that duty proximately causes the loss. *See id.* at 443 n.1, 441 S.E.2d at 319 n.1; *Cooke*, 741 F. Supp. at 1209 n.1 (citation omitted); *see also id.* at 1209–14 (discussing four exceptions to the general "no duty" rule, including the affirmative acts exception, concealed danger exception, common area exception, and undertaking exception).

This is consistent with section 323 of the Restatement (Second) of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the

other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

> (a) his failure to exercise such care increases the risk of such harm, or

> (b) the harm is suffered because of the other's reliance upon the undertaking.

Petitioner, through her expert witness and otherwise, has relied primarily on subpart (b)—"reliance upon the undertaking"—to impose a duty on Respondents with respect to the security officer program. However, the record is devoid of any evidence of reliance by Petitioner. As the majority correctly points out, when Petitioner confronted Respondents' representative the day after her ordeal, she "exclaimed that she had not seen any security on the premises *since she moved in five years prior*." (Emphasis added). I cannot fathom how, after not seeing any evidence of a security officer for five years, Petitioner could have possibly relied on the existence of a security officer program.[7] The absence of reliance evidence would seem to preclude section 323 as the source of Respondents' broad duty to prevent crime at the apartment complex.

Nevertheless, assuming the existence of a duty, I would find Petitioner's claim fails as a matter of law due to the absence of evidence creating a genuine issue of material fact concerning proximate cause. "Proximate cause requires proof of: (1) causation-in-fact, and (2) legal cause." *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006). "Causation-in-fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence, and legal cause is proved by establishing foreseeability." *Id.* (stating foreseeability is determined by looking at the natural and probable consequences of the defendant's acts or omissions). I find that, under the undisputed facts, Petitioner can satisfy

---

[7] Similarly, when Petitioner previously had problems at the complex with a young person going door-to-door and selling magazine subscriptions, she directly called the sheriff's office rather than the courtesy officer number. While Petitioner may have factored the security officer program into her decision to move to the complex five years before the incident, it seems her reliance on that program—even for minor things like discouraging nuisance solicitations—was nonexistent five years later, at the time in question.

neither of these requirements.[8]

First, as framed by the majority, Respondents' breach of duty was that they did not employ a security officer at the time of the robbery, nor did they "notify apartment tenants of the absence of officers and the true limitations of the courtesy officer program." Even viewing the evidence in the light most favorable to Petitioner, there is no proof whatsoever that Petitioner would not have suffered her injuries but-for Respondents' alleged failures. For example, Petitioner did not actually call the security pager number and fail to get a response. Nor did Petitioner produce any evidence that, had Respondents currently employed a courtesy officer, the officer would have (1) been on patrol at the time or (2) prevented or stopped the robbery.

The majority places importance on the opinion of Petitioner's security expert, William Booth, who opined that (1) had Respondents employed a security officer, that officer could have patrolled the complex five to six times in his requisite two-hour shift, i.e., completed a circuit around the complex approximately every twenty to twenty-four minutes for two hours per day; and (2) "had the courtesy officers been there and [] been patrolling the property as required that the perpetrators in this crime more likely than not would not have been in the position to rob and kidnap" Petitioner. Booth's desire for an optimal security program in no way establishes a genuine issue of material fact as to causation-in-fact because it does not specify whether the required two-hour patrol always occurred during the same time of day as the time of the robbery. The majority speculates that, had Petitioner known there were no security officers present, "there is a reasonable inference to be derived from the evidence that having this knowledge would have affected her actions on the night of the incident." Such a conclusion is conjecture, at best, particularly given the fact that Petitioner had not seen a single security officer in the five years she lived at the complex.[9] Accordingly, I would find the connection

---

[8] Petitioner may not look to Section 323 to rescue her on the issue of proximate cause. This is because this Court has previously held section 323 applies only to duty, at least for medical malpractice claims. *See Sherer v. James*, 290 S.C. 404, 408, 351 S.E.2d 148, 150 (1986) ("Therefore, we hold that even if section 323(a) does apply in a medical malpractice case, it applies only to duty and not proximate cause.").

[9] In fact, the majority's speculation seemingly relies on subpart (b) of section 323—"reliance upon the undertaking"—as a crutch to help show Petitioner presented evidence of proximate cause, which is expressly contrary to our previous statement in *Sherer* that section 323 encompasses only duty, not proximate cause.

between Respondents' alleged breach of duty and Petitioner's injuries is so attenuated that, as a matter of law, there is no genuine issue of material fact regarding causation-in-fact.

Likewise, viewing the evidence in the light most favorable to Petitioner, I would find there is no evidence this robbery was foreseeable. In fact, the evidence points to the lack of foreseeability. Law enforcement officers testified the crime rate in the apartment complex was "average." *See Cramer I*, 312 S.C. at 443, 441 S.E.2d at 318 ("Absent agreement, the landlord cannot be expected to protect [his tenants] against the wiles of felonry any more than the society can always protect them upon the common streets and highways leading to their residence or indeed in their home itself. . . . *The criminal can be expected anywhere, any time, and has been a risk of life for a long time*." (emphasis added) (citation omitted)). There is no suggestion Respondents knew the risk of injury to the complex's tenants was higher than the risk to the public at large. *See Cody P. v. Bank of Am., N.A.*, 395 S.C. 611, 621, 720 S.E.2d 473, 478 (Ct. App. 2011) ("Foreseeability is determined from the defendant's perspective at the time of the negligent act allegedly causing the plaintiff's injury.").[10]

---

*See Sherer*, 290 S.C. at 408, 351 S.E.2d at 150 (determining section 323(a) applies only to duty and not proximate cause).

[10] *See also, e.g.*, *Stone v. Bethea*, 251 S.C. 157, 164, 161 S.E.2d 171, 174–75 (1968) (affirming the grant of a directed verdict based on the absence of proximate cause as a matter of law because, *inter alia*, the intervening criminal act occurred in a low-crime area where it was unforeseeable the crime would occur); *Jeffords v. Lesesne*, 343 S.C. 656, 664–65, 541 S.E.2d 847, 851 (Ct. App. 2000) (finding the issue of proximate cause presented a jury issue in the case of injuries resulting from a bar fight because, *inter alia*, (1) the place in which the injuries occurred was a high-crime area; (2) the character of the event during which the injuries occurred involved heavy alcohol consumption and was targeted to "attract[] bystanders who were within this [high-crime] area," and (3) in "[p]erhaps the most compelling" piece of evidence, the allegedly-negligent bar staff *were specifically aware* the attacker was heavily intoxicated and acting obnoxious and aggressive for several minutes prior to the assault); *Goode v. St. Stephens United Methodist Church*, 329 S.C. 433, 448, 494 S.E.2d 827, 835 (Ct. App. 1997) (affirming the grant of summary judgment to the allegedly negligent landlord because, despite providing limited security patrols in the apartment complex, the landlord had no notice the attack on the plaintiff was going to occur, and therefore had no reason to foresee that a breach of any alleged duties to protect the complex's tenants and guests

The majority acknowledges "the existence of proximate cause indeed may hang by a slender thread."  I do not find even a thread of evidence to save Petitioner's claim against Respondents.  In addition, I am concerned the majority's decision disincentivizes apartment complexes from offering a security officer program at all.  I dissent.

---

would have the natural and probable consequence of resulting in an intentional attack on the plaintiff by third parties).