**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Fayetta Sherida Davenport, individually and on behalf of the Estate of James Davenport, Appellant,

v.

Town of Iva, S.C., Respondent.

Appellate Case No. 2017-002612

———————————

Appeal From Anderson County
J. Cordell Maddox, Jr., Circuit Court Judge

———————————

Opinion No. 2023-UP-318
Heard September 22, 2020 – Filed September 27, 2023

———————————

**AFFIRMED**

———————————

James Mixon Griffin, of Griffin–Davis, of Columbia, for Appellant.

Mary C. McCormac, of Mary C. McCormac Attorney at Law, LLC, of Clemson, for Respondent.

———————————

**MCDONALD, J.:** In this tragic case, Fayetta Davenport argues the circuit court erred in finding the Town of Iva owed no special duty of care to protect her family from her violent son. We affirm the circuit court's directed verdict.

**Facts and Procedural History**

On a Sunday evening in July 2012, Robert Frost violently attacked his mother and stepfather, James Davenport, in their home. James did not survive the attack.[1] Earlier that afternoon, Frost left the couple threatening voicemail messages; the Davenports alerted law enforcement after Frost stated in one of the messages that "blood would flow in Iva."

At approximately 3:20 p.m. on the afternoon of Frost's threatening calls, Iva patrol officer Timothy Richey responded to the Davenports' home and listened to the messages. In Officer Richey's presence, Davenport called the number from which Frost made the calls. Frost answered, claiming to be "Jackie," his deceased brother. According to Officer Richey, Davenport told him Jackie was her son "that passed away, that is Robert who you're talking to." Officer Richey testified that he identified himself, stated he was with the police department, and told Frost, "You don't need to call your parents no more, you don't need to be harassing them, you don't need to be trying to come over . . . . Don't come over, don't call again." Officer Richey noted Frost "never threatened anything suicidal in that phone call, he never threatened that he was going to hurt anybody when I talked to him." He also told "Jackie" that if the harassing calls continued, "a warrant would be issued" and "he would be locked up if he came to Iva."

Once Officer Richey ended the call, he asked Davenport what the couple wanted him to do. Davenport testified that she responded, "Anything it takes to keep Robert Frost from coming to Iva." Davenport claims Officer Richey replied, "Well, if he comes, y'all lock your doors and hide and call me—or call 911." However, Davenport admitted Officer Richey instructed her "to call 911 immediately if her son called again or if he came to her house."

At the 5:00 p.m. shift change that afternoon, Officer Richey gave Lieutenant Christopher Vaughn information about the threatening calls and asked him to keep an eye on the Davenport's home.

---

[1] At the time of the murder, Frost had a documented history of violent behavior, which included burning down his mother's former home, burning down his brother's mobile home, and attempting to kill James on a prior occasion by slashing his face. In the 1980s, Frost served sentences of one year for the attempted murder of his stepfather and ten years for arson.

Sometime after Officer Richey left the Davenports' house, Frost again called his mother. This time, Frost was contrite and made statements that Davenport interpreted to mean he was considering suicide. Despite having been specifically instructed to call 911 if Frost called again, she did not call 911 or Officer Richey because "[Frost] said he was sorry." Davenport believed her son had settled down and was not going to bother the family further that night. On cross-examination, however, Davenport admitted James did not think Frost's suicide comments were serious and told her Frost was just "pulling one of his tricks."

Around 7:30 that evening, the Davenports' neighbor, Becky Keith, pulled into her driveway on East Lake Street and called 911 to report a burglary in progress: "I told them that somebody rode up on a motorcycle and kicked in the backdoor. My neighbor's backdoor. And I heard screaming, yelling, coming from the house."

Lieutenant Vaughn was conducting a safety patrol of the Davenports' address when the neighbor's 911 call came in. He testified he had been keeping an eye on the house by driving down Front Street, where the Davenport home shares a corner with East Lake Street. Lieutenant Vaughn responded to the 911 call "roughly, between 40 and 48 seconds" after passing the Davenport's house. Upon arrival, he found Frost covered in blood and trying to flee on his motorcycle. After securing Frost and calling for backup, Lieutenant Vaughn entered the Davenports' home and found Frost had stabbed his stepfather to death and injured his mother.

Iva Police Chief Thomas Miller was aware of Frost's past violent behavior, and testified that he anticipated there would be another altercation between Frost and James at some point. He also knew that two months before the fatal attack, Frost had come to Iva to demand money from his mother. On that day, Davenport gave her son her debit card and then called the police. Chief Miller and another officer responded to the May call, found Frost using his mother's ATM card, and put him on a trespass notice for her home. Although Chief Miller instructed Davenport to call 911 if Robert violated the trespass notice, when Frost subsequently approached his mother on her porch, she did not report the violation because he left when she told him to go and "he was there less than two minutes."

Davenport testified that in the aftermath of James's murder, Chief Miller apologized for "letting her down" and for not doing a better job protecting the family. Additionally, Davenport's nephew testified that when law enforcement came to retrieve the recordings from the Davenports' phone, Chief Miller "made a statement that he was apologetic about [the fact that] he should have done a better

job at taking Robert's threats more serious[ly], that he should have done a better job protecting James."

Davenport filed this action asserting the Town's police department was negligent and grossly negligent in breaching its common law duty of care "to protect the bodily integrity of Plaintiff and her deceased husband, James." The Town moved to dismiss, or alternatively for summary judgment, asserting the protections of the South Carolina Tort Claims Act,[2] as well as a defense that its employees did not owe a "special duty" of care to the Davenports "outside of the duty owed to the public at large; thus, the public duty rule operates to bar her lawsuit." Following a hearing, the circuit court denied the Town's motion, and the case went to trial. After the close of Davenport's case-in-chief, the circuit court directed a verdict for the Town "based upon the fact that [the court did not find] that there's any duty." Davenport seeks a new trial.

**Law and Analysis**

"In ruling on motions for directed verdict and JNOV, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions and to deny the motions where either the evidence yields more than one inference or its inference is in doubt." *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 434, 629 S.E.2d 642, 648 (2006). "The appellate court will reverse the trial court's ruling on a directed verdict motion only when there is no evidence to support the ruling or where the ruling is controlled by an error of law." *Donevant v. Town of Surfside Beach*, 414 S.C. 396, 406, 778 S.E.2d 320, 326 (Ct. App. 2015), *aff'd*, 422 S.C. 264, 811 S.E.2d 744 (2018) (quoting *Jones v. Lott*, 349 S.C. 285, 288–89, 665 S.E.2d 642, 644 (Ct. App. 2008)).

Davenport argues the circuit court erred in finding the Town owed no special duty of care despite its affirmative acts to address the Davenports' safety because: (1) there is sufficient evidence from which a reasonable jury could conclude the Town voluntarily assumed a duty to protect the Davenports and then failed to exercise reasonable care; (2) special circumstances existed giving rise to a duty of care; and (3) Davenport provided evidence from which a jury could find the Town's agents were negligent and grossly negligent. We disagree.

---

[2] S.C. Code Ann. §§ 15-78-10 to -200 (2005 and Supp. 2022).

"In a negligence action, '[t]he court must determine, as a matter of law, whether the law recognizes a particular duty." *Repko v. Cnty. of Georgetown*, 424 S.C. 494, 500, 818 S.E.2d 743, 747 (2018) (quoting *Steinke v. S.C. Dep't of Lab., Licensing & Regul.*, 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999)). "If there is no duty, then the defendant in a negligence action is entitled to a directed verdict." *Id.* (quoting *Steinke*, 336 at 387, 520 S.E.2d at 149). "An affirmative legal duty to act may be created by statute, contract relationship, status, property interest, or some other special circumstance." *Arthurs ex rel. Estate of Munn v. Aiken Cnty.*, 346 S.C. 97, 103, 551 S.E.2d 579, 582 (2001). Public officials are "generally not liable to individuals for their negligence in discharging public duties as the duty is owed to the public at large rather than anyone individually." *Vaughan v. Town of Lyman*, 370 S.C. 436, 441, 635 S.E.2d 631, 634 (2006). "An exception to this general rule of non-liability exists when a duty is owed to individuals rather than the public only." *Jensen v. Anderson Cnty. Dep't of Soc. Servs.*, 304 S.C. 195, 200, 403 S.E.2d 615, 617 (1991).

Here, Davenport relies on the common law to support her argument that the Town violated a duty of care and properly asserts that "under the South Carolina Tort Claims Act, [the Town] is to be treated as a private citizen for purposes of determining whether a duty exists."[3]

Although there is no general duty to control the conduct of another or to warn a potential victim of danger, there are five exceptions to this general rule:

> 1) where the defendant has a special relationship to the victim; 2) where the defendant has a special relationship to the injurer; 3) where the defendant voluntarily undertakes a duty; 4) where the defendant negligently or intentionally creates the risk; and 5) where a statute imposes a duty on the defendant.

*Edwards*, 386 S.C. at 291, 688 S.E.2d at 128 (quoting *Faile v. S.C. Dep't. of Juv. Just.*, 350 S.C. 315, 334, 566 S.E.2d 536, 546 (2002)); *see also Russell v. City of*

---

[3] "When the duty is created by statute, we refer to this as a 'special duty,' whereas when the duty is founded on the common law, we refer to this as a legal duty arising from 'special circumstances.'" *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 290, 688 S.E.2d 125, 128 (2010) (quoting *Arthurs*, 346 S.C. at 109–10, 551 S.E.2d at 585).

*Columbia*, 305 S.C. 86, 89, 406 S.E.2d 338, 339 (1991) ("Under common law, even where there is no duty to act but an act is voluntarily undertaken, the actor assumes the duty to use due care.").

Our supreme court has considered in a number of cases the question of whether a legal duty arises from special circumstances in the law enforcement context. For example, in *Edwards v. Lexington County Sheriff's Department*, after the plaintiff was attacked by her ex-boyfriend outside a magistrate's office, the supreme court found the sheriff's department owed her a common law duty because of the unique circumstances of her case. 386 S.C. at 294, 688 S.E.2d at 130. These circumstances included the sheriff's department relationship with Edwards, its knowledge of her former boyfriend, Allen Baker, and the department's own actions in creating the risk of harm. *Id.* at 293, 688 S.E.2d at 129–30. Finding "special circumstances" existed for purposes of the duty analysis, the court explained:

> Respondents were well aware of Baker's unrelenting violent tendencies toward Edwards. Edwards had called the sheriff's office to report Baker's harassment on numerous occasions, and the sheriff's office arranged for Edwards to stay in a hotel after one of the incidents. The sheriff's office. . . . arranged the bond revocation hearing at the magistrate's office with no security present. Despite Respondents' awareness that Edwards feared Baker and was reluctant to attend the bond revocation, Respondents strongly encouraged Edwards' presence.
>
> Respondents cannot claim lack of knowledge of Baker's violent tendencies towards Edwards since the reason they were seeking to revoke Baker's bond was due to his failure to obey the no-contact order, which was issued as a direct result of his violent actions. We hold Respondents created a situation in which it was foreseeable that Baker would harm Edwards.
>
> We hold that Respondents owed Edwards a duty solely as a result of the unique facts of this case, i.e., "special circumstances." Respondents created a situation that they knew or should have known posed a substantial risk of injury to Edwards. Moreover, given Respondents' knowledge of Baker's demonstrated threats against

> Edwards, Respondents owed her a duty. Respondents'
> duty is one of due care and whether Respondents acted
> reasonably, negligently or grossly negligently is not
> before us. We do note that Respondents were not under a
> duty to guarantee Edwards' safety with absolute certainty.

*Id.* at 293–94, 688 S.E.2d at 130.

Davenport asserts two of the exceptions to the general rule considered in *Edwards* applied to defeat the directed verdict motions in her case: the Town's voluntary undertaking of a duty and the police department's special relationship to the victims. While there are some similar aspects, such as an attack by an assailant with a close relationship to the victim and law enforcement's prior knowledge of the dangerous individual, the facts of this case differ markedly from those of *Edwards*. Like the sheriff's department in *Edwards*, the Town was aware of Frost's harassment of and violent tendencies toward the Davenports. However, in *Edwards,* the sheriff's department controlled the premises where Edwards was attacked and "strongly encouraged" her to attend the bond revocation hearing— where officers knew her physically abusive ex-boyfriend would be present—and then failed to provide *any* security. *Id.* at 293, 688 S.E.2d at 130. Here, the Town neither created the hazardous circumstances nor invited the Davenports to a dangerous situation.

The "voluntary undertaking" Davenport alleges relates to Officer Richey's increased safety patrols at the Davenport residence, which he testified he asked Lieutenant Vaughn to implement when Vaughn arrived to start his evening shift. But there is no evidence in the record to suggest the Davenports were aware of the safety patrols until after this lawsuit began. This supports the circuit court's finding that the Davenports did not rely on a voluntary undertaking by the Town in making their decision to remain in their home after receiving Frost's threatening phone calls. Davenport claims in her complaint that the couple relied on Officer Richey's advice to hide with the doors locked and call 911 if Frost called again or came to their house, believing "they would be safe staying in their home with the doors locked." But there is no evidence in the record that Officer Richey advised the couple to stay in the home or guaranteed their safety, and—contrary to his specific instruction—Davenport failed to call 911 or otherwise alert law enforcement when Frost called her back that afternoon to express his contrition.

Nor did Davenport testify or present other evidence that the couple relied on advice from Officer Richey in choosing to remain in their home. Instead, she explained

that she and her husband stayed that night because they felt safer there and were "homebodies," who "preferred to stay home." Davenport additionally stated that, after listening to Frost's voicemail apology, she thought he had settled down and would not bother the couple further. Therefore, even as we view "the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to" the plaintiff, we agree with the circuit court that no affirmative act (or failure to act) by the Town increased the risk of harm Frost presented to his mother and stepfather. *Law*, 368 S.C. at 434, 629 S.E.2d at 648. In sum, Davenport was unable to present evidence that the couple relied on a voluntary undertaking, and she admittedly disregarded the responding officer's specific instruction to alert law enforcement if Frost contacted her again.

Davenport contends our supreme court's reversal of summary judgment in *Wright v. PRG Real Estate Management, Inc.*, 426 S.C. 202, 826 S.E.2d 285 (2019), supports her argument that the circuit court erred in declining to submit to the jury the question of whether a "voluntary undertaking" by the Town created special circumstances giving rise to a duty of care to the Davenports. In *Wright*, a tenant sued her landlord and apartment complex managers after she was abducted at gunpoint from the complex parking lot. *Id.* at 205–06, 826 S.E.2d at 287. The tenant claimed the defendants negligently failed to protect residents from third-party criminal activity by failing to provide appropriate lighting, failing to maintain overgrown shrubbery, and failing to properly manage the complex's courtesy security officer program. *Id.* at 206, 826 S.E.2d at 287. The circuit court granted summary judgment in favor of the landlord defendants, and a divided court of appeals affirmed. *Id.* at 209, 826 S.E.2d at 289. However, a divided supreme court reversed, noting the tenant's "reliance upon the undertaking" of her landlord to provide security and explaining:

> The recognition of a voluntarily assumed duty in South Carolina jurisprudence is rooted in section 323 of the Restatement (Second) of Torts (1965),[] which provides:
>
>> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Under section 323, the voluntary undertaking does not create a duty of care unless (a) the undertaker's failure to exercise reasonable care in performing the undertaking increased the risk of harm to the plaintiff, or (b) the plaintiff suffered harm because she relied upon the undertaking.

*Id.* at 213, 826 S.E.2d at 290–91 (footnote omitted).

The majority emphasized plaintiff's testimony that she chose the apartment complex, at least in part, because "there were security officers on duty. So [she] felt like it would be a safe place." *Id.* at 219–20, 826 S.E.2d at 294. Thus, the supreme court reversed the grant of summary judgment, finding the landlord defendants' failure to provide the security upon which the tenant specifically relied triggered the Restatement's "voluntary undertaking" exception and required evaluation by a jury. *Id.* at 221, 826 S.E.2d at 295.

By contrast, the evidence here support does not support a finding of a voluntary undertaking. No act of the Town or its agent increased the risk of harm to the Davenports, and the plaintiff demonstrated her lack of reliance when she disregarded the responding officer's specific instruction to call 911 if her son contacted her again.[4] Accordingly, the circuit court's grant of a directed verdict is

**AFFIRMED.**

**KONDUROS, J., and LOCKEMY, A.J., concur.**

---

[4] As our holding on the duty question is dispositive, we decline to address the parties' Tort Claims Act arguments. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating court need not address remaining issues when disposition of a prior issue is dispositive).