# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The Estate of Delila Parrott, Respondent,

v.

Sandpiper Independent and Assisted Living-Delaware, LLC, Appellant.

Appellate Case No. 2020-001643

---

Appeal From Charleston County
Bentley Price, Circuit Court Judge

---

Opinion No. 6067
Heard March 12, 2024 – Filed June 26, 2024

---

**REVERSED**

---

Stephen Lynwood Brown, Russell Grainger Hines, Matthew Oliver Riddle, Donald Jay Davis, Jr., and James Edward Scott, IV, all of Clement Rivers, LLP, of Charleston, for Appellant.

Todd Richard Lyle, of Lyle Law Firm LLC, and Paul L. Reeves, of Reeves Law Firm, LLC, both of Columbia; and John G. Boswell, of Raleigh, North Carolina, all for Respondent.

---

**GEATHERS, J.:** In this wrongful death and survival action, Sandpiper Independent & Assisted Living-Delaware, LLC (Sandpiper) challenges the circuit court's order following a bench trial finding Sandpiper liable for the death and conscious pain and suffering of Delila Parrott and awarding $1,000,000 to Parrott's estate (Respondent).

Sandpiper argues that the circuit erred in finding that (1) Sandpiper owed Parrott a duty, (2) Sandpiper's breach of that duty proximately caused Parrott's death, and (3) Sandpiper failed to establish comparative negligence as a defense. Sandpiper also contests the circuit court's calculation of damages, arguing the award was wholly undue and speculative or excessive. We reverse.

## FACTS

Tragically, Delila Parrott, who was eighty years old, fell from a rocking chair she was standing on to hang curtains in her apartment at Sandpiper's independent living community. Though the exact timeline is disputed, Parrott could have fallen as early as the evening of Tuesday, June 3, 2014. The fall caused comminuted fracturing of Parrott's hip, resulting in complete immobility as she laid until the evening of June 6, when Sandpiper's staff entered Parrott's apartment and called emergency services.

Parrott spent four days in the hospital to treat her broken hip and other conditions related to her fall before being discharged and sent to a rehabilitation facility owned by Sandpiper. From rehab, she was moved into an assisted living community. Having never returned to an independent living community, she was hospitalized in January 2015 for mental health reasons, entered hospice care on January 31, 2015, and died on February 9, 2015—eight months after the fall. Her death certificate listed her causes of death as "failure to thrive" and "chronic schizophrenia," among other things. Respondent contended at the bench trial that Parrott's death was the result of a "long lie"—a medical condition that occurs when an elderly person is left immobile after a fall for an extended period as they await rescue—as opposed to her broken hip from the fall.[1] *See 4 Attorneys Medical Advisor* § 33:123 (Monique Leahy ed., 2024) (explaining long lies in both injured and uninjured "fallers" and noting studies showing that older fallers who could not get up were "more likely to suffer a lasting decline in activities of daily living," but

---

[1] Included in the record as a trial exhibit is a 1996 special article from the New England Journal of Medicine examining the long lie phenomenon. This article notes that "[t]he total mortality was [67%] for patients who were estimated to have been helpless for more than [seventy-two] hours, as compared with [12%] for those who had been helpless for less than [one] hour." However, the study acknowledged that it was unable "to determine the independent influence of functional status, the length of time spent helpless, the extent of social support, diagnosis, demographic variables, or a number of other factors on the outcomes of persons found dead or helpless in their homes."

that the increased likelihood of death and hospitalization arising therefrom was not statistically significant).

## I.    Background on Sandpiper and its Check-In Policy

In the independent living community where Parrott lived, Sandpiper offered several amenities to its residents.  These amenities included two meals per day, planned activities for the residents, general maintenance services, weekly laundry and housekeeping services, and transportation for social events.  Though it was not contained in the lease, Sandpiper also operated a daily check-in policy whereby a staff member would sign off for each resident on a sheet at the front desk once daily, confirming that the resident had been seen or at least heard from.  Specifically, an internal document outlining procedures and policies for Sandpiper's front desk workers stated, "All residents must be seen by staff and initialed off every day.  If you do not see someone, call them[.  I]f you can't get them on the phone, go to the apartment and check on them."  Corrine Carrington, the executive director of Sandpiper's independent living community, further explained:

> We check the residents daily, make sure we saw them.  If
> we hadn't seen the residents by a certain time at night, we
> were to be calling them.  If they didn't answer their phone,
> we should be going to the units to check on them, to make
> sure we saw them.

Carrington also explained that Sandpiper had duplicate keys for each apartment in addition to a master key and that if a resident who had not yet been checked on did not answer the door, the staff would use one of these keys to enter the apartment.

Residents at Sandpiper were also issued a "panic button"—a wearable device that allowed residents to call for help in an emergency.  Carrington testified that although "the majority [of residents] probably wore their panic button[,] . . . it was not uncommon for some of them not to wear it."  Carrington and Beth Auld, a longtime Sandpiper employee, agreed that the panic button was Sandpiper's primary response to falls.  It is undisputed that Parrott was not wearing her panic button when she was attempting to hang the curtains.

## II.    Background on Parrott

Parrott signed a lease to live at Sandpiper in April 2013.  Joan Acosta, Parrott's daughter and personal representative, explained that, prior to this, even though

Parrott "was still independent," Acosta "wanted to be proactive . . . and get [Parrott] in a situation where there would be transportation available, where she would have activities available, [and] where she was checked [on] every[ ]day." The lease Parrott signed contained the following language:

> Sandpiper is not responsible for the negligence of its [o]ccupants including acts or omissions that cause injury or death to other persons or damage to property. . . . You agree to be responsible . . . and hold Sandpiper . . . harmless from and against[] any and all claims . . . resulting from any injury to or death of any person and/or any damage to property caused by, resulting from, attributable to, or in any way connected with acts or omissions of or on the part of you as occupant.

The lease further stated:

> Both Sandpiper and you agree that your freedom to make personal health and *non-health related decisions*, the freedom to travel, to come and go as you please, *the decisions that* [*a*]*ffect and control your day-to-day activities* should all remain within your sole decision so long as it does not adversely affect other occupants. As such, both Sandpiper and you understand and realize that such decision making ability carries an inherent possibility of adversity that may directly or indirectly affect you as occupant. *Therefore, you . . . agree to assume such risk and related consequences and, as it relates to Sandpiper, . . . waive any and all liability against* [*Sandpiper*] *from any and all damages, both direct and indirect, that may result from such activities, the risks*[*,*] *and the . . . damages resulting from such activities.*

(emphases added). Though Parrott began suffering from mental health problems around 2009, which included periods of delusions, her condition was considered stable prior to the fall. In her report following Parrott's fall, Carrington described Parrott as "very private" and noted that Parrott had told her at least once that she (Parrott) did not want anyone in her apartment. Consequently, Carrington made a note on Parrott's file that Parrott was "fearful of people coming in without her knowledge" and that "no one is allowed in [Parrott's apartment] without [Parrott]

being present." Carrington also testified that Parrott "was probably concerned about her privacy[] more than any other resident," but noted that a resident's privacy should not deter staff from entering for the purposes of conducting a check-in.[2]

Carrington also stated that about four months prior to the fall, Parrott had changed her locks. Carrington explained that she learned about the changed locks only after she came upon Parrott struggling to unlock her apartment and that though Parrott was hesitant to provide Sandpiper with a duplicate key for the changed locks, she ultimately relented and provided one.

## III.   Parrott's Fall and Long Lie

Though the parties disputed at trial the timeline for Parrott's fall, the circuit court accepted Respondent's formulation: Parrott fell on the evening of Tuesday, June 3, and was not found until Friday, June 6, despite the daily check-in policy. Towards the end of the day on Wednesday, June 4, one of Sandpiper's employees, Rebecca Munoz, noticed that Parrott was not signed off on the daily check-in sheet. Consequently, Munoz walked over to Parrott's unit with the master key to check on her after unsuccessfully trying to call her. Munoz knocked on the door, but no one answered. Munoz attempted to enter the apartment using the master key, but it did not work because Parrott had changed her locks. However, Munoz did not walk the "very short distance" back to the office from Parrott's apartment to obtain the duplicate key that would have allowed her to enter the apartment.[3] Instead, she called Auld, who, in addition to being a longtime Sandpiper employee, is also Munoz's mother. Together, they decided Munoz did not need to enter Parrott's apartment that night to complete the check-in; instead, Munoz asked Auld to check on Parrott on Thursday. Although Auld did not recall the details of the conversation with Munoz, she agreed that Parrott's privacy concerns "definitely" factored into the decision not to enter Parrott's apartment, and Munoz testified to the same. Munoz completed her shift and went home having never visually confirmed Parrott's wellbeing. Munoz was not scheduled to work again until Friday, June 6.

---

[2] Carrington later seemed to acknowledge that even though it *should* not impact a decision on whether to enter a resident's apartment, it *could*.

[3] Munoz claimed that she did not know where to find the duplicate key for Parrott's apartment after she tried to enter unsuccessfully with the master key. However, she answered affirmatively when asked if she knew where to locate the key when she eventually returned and entered Parrott's apartment Friday evening.

The next day—Thursday, June 5—Auld reported to work and signed off on having seen Parrott. Auld later maintained to Carrington that her marking the check-in sheet was accurate and reflected the fact that Auld had seen Parrott on June 5. However, even though Sandpiper's practice was to preserve records of the check-in sheets, the June 5 record with Auld's signature no longer existed at the time of the trial. Additionally, Auld could not recall at trial exactly when or where she purportedly saw Parrott on Thursday. A friend and neighbor of Parrott's, Lila Watters, stated that she did not see Parrott on June 5 even though the two regularly dined together.

On Friday, June 6, Munoz returned to work. That evening, at the urging of Watters, Munoz used the duplicate key to enter Parrott's apartment and found Parrott lying on the floor. Though Parrott told EMS that she had fallen on Tuesday, she later told Carrington that she fell on Wednesday. Parrott's longtime physician, Dr. Richard Mills, testified:

> I would be willing to say with a reasonable degree of medical certainty that [Parrott] was on the ground most likely, in my mind, somewhere between thirty-six hours to three days. But I don't think it was in the four-hour to the twenty-four-hour range. And I tend to think that based on the things I saw . . . in the record that it was longer than that.

Respondent's theory of the case at the bench trial was that although Parrott recovered physiologically from her broken hip, the extended period of time she spent on the floor amounted to a long lie. Further, they maintained that this long lie drained Parrott of her will to live and resulted in her death. Dr. Mills agreed at the bench trial that Parrott's long lie shortened her life. Dr. Mills explained that based on Parrott's recovery from the surgery for her hip, he expected her to live "many more years" and that her death within eight months was unexpected. Dr. Mills also testified that the longer the amount of time Parrott spent on the floor, the more adverse the consequences of the long lie would have been on her mental health.

Respondent also introduced testimony from Dr. Lawrence Bergmann, an expert witness in trauma, that Parrott's psychological condition continually declined following the fall and that the scientific literature supported finding a causal link between Parrott's time on the floor and her eventual death.[4]

---

[4] Dr. Bergmann's testimony was presented via a deposition *de benne esse*.

In October 2016, Acosta, as personal representative of Parrott's estate, brought wrongful death and survival actions against Sandpiper, alleging that Sandpiper negligently caused Parrott's death by breaching its internal policy requiring a Sandpiper staff member to sign off on a check-in sheet each day indicating they had verified the wellbeing of each resident. Following a bench trial, the circuit court awarded Respondent $500,000 for the wrongful death cause of action and $500,000 for the survival action. Sandpiper moved post-trial for relief from the judgment, which the circuit court denied on November 18, 2020. This appeal follows.

## ISSUES ON APPEAL

I. Did the circuit court err by finding that Sandpiper owed Parrott a duty?

II. Did the circuit court err by finding that Sandpiper's breach of the duty it owed Parrott proximately caused Parrott's conscious pain and suffering and death?

III. Did the circuit court err by failing to find comparative negligence on the part of Parrott?

IV. Did the circuit court err in its calculation of the $1,000,000 award?

## STANDARD OF REVIEW

"In an action at law tried by a judge without a jury, the appellate court will correct any error of law, but it must affirm the trial court's factual findings unless no evidence reasonably supports those findings." *Frazier v. Smallseed*, 384 S.C. 56, 61, 682 S.E.2d 8, 11 (Ct. App. 2009) (per curiam). Wrongful death and survival actions are actions at law. *See First Union Nat'l. Bank of S.C. v. Soden*, 333 S.C. 554, 574, 511 S.E.2d 372, 382 (Ct. App. 1998) ("[T]he character of an action as legal or equitable depends on the relief sought."); *see also Longshore v. Saber Sec. Servs., Inc.*, 365 S.C. 554, 560, 619 S.E.2d 5, 9 (Ct. App. 2005) ("An action in tort for damages is an action at law."); S.C. Code Ann. § 15-51-10 (2005) (establishing the wrongful death cause of action as "an action for damages.").

## LAW AND ANALYSIS

We hold that Sandpiper owed Parrott no duty because (1) internal policies cannot, standing alone, create a duty in South Carolina, and (2) there is no evidence

that Parrott's harm was caused by her reliance on the check-in policy. Therefore, we reverse the circuit court.

Section 15-51-10 of the South Carolina Code imposes liability on tortfeasors who cause the death of another party through a wrongful act, neglect, or default that would have entitled the injured party to maintain an action for damages had they survived.[5] *See generally Land v. Green Tree Servicing, LLC*, 140 F. Supp. 3d 539, 544–45 (D.S.C. 2015) (exploring the history of wrongful death actions in South Carolina and concluding that "the plaintiff in a wrongful death action must establish that the wrongful act or *negligence* of the defendant caused the death of the decedent." (emphasis added)).

"A plaintiff must prove three elements on a negligence claim: '(1) a duty of care owed by [the] defendant to [the] plaintiff; (2) breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty.'" *Dawkins v. Sell*, 434 S.C. 572, 581, 865 S.E.2d 1, 5 (Ct. App. 2021) (alterations in original) (quoting *J.T. Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 368–69, 635 S.E.2d 97, 101 (2006)). "If no duty has been established, evidence as to the standard of care is irrelevant. Only when there is a duty would a standard of care need to be established." *Doe ex rel. Doe v. Wal-Mart Stores, Inc.*, 393 S.C. 240, 247, 711 S.E.2d 908, 912 (2011). Here, Sandpiper contests the circuit court's conclusions on duty and causation.

---

[5] In full, the statute reads:

> Whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the killing in law a felony. In the event of the death of the wrongdoer, such cause of action shall survive against his personal representative.

§ 15-51-10.

"A tortfeasor's duty arises from his relationship to the injured party." *Ravan v. Greenville County*, 315 S.C. 447, 467, 434 S.E.2d 296, 308 (Ct. App. 1993) (quoting *S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 289 S.C. 373, 376, 346 S.E.2d 324, 325–26 (1986)).  "It is essential [for] liability for negligence to attach that the parties shall have sustained a relationship recognized by law as the foundation of a duty of care."  *Id.*  Whether a duty exists is a question of law. *McCord v. Laurens Cnty. Health Care Sys.*, 429 S.C. 286, 296, 838 S.E.2d 220, 225 (Ct. App. 2020).  Furthermore,

> [t]here is no formula for determining duty; a duty is not sacrosanct in itself but only an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection.  Suffice it to say that a multiplicity of factors come into play when courts contemplate the question of duty.  These factors include the policy of deterring future tortfeasors, the moral culpability of the tortfeasor and numerous other conceivable factors; duty is seen in general terms as requiring a person or corporation to conform his or its conduct to a standard which is adequate to protect others from unreasonable risk of harm.

*Araujo v. S. Bell Tel. & Tel. Co.*, 291 S.C. 54, 57–58, 351 S.E.2d 908, 910 (Ct. App. 1986) (footnote omitted).

In South Carolina, "there is no general duty to control the conduct of another." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656 (2006).  Consequently, "a person usually incurs no liability when he fails to take steps to protect others from harm not created by his own wrongful conduct." *Degenhart v. Knights of Columbus*, 309 S.C. 114, 116, 420 S.E.2d 495, 496 (1992).  However, there are five main exceptions to this rule:

> (1) where the defendant has a special relationship to the victim; (2) where the defendant has a special relationship to the injurer; (3) where the defendant voluntarily undertakes a duty; (4) where the defendant negligently or intentionally creates the risk; and (5) where a statute imposes a duty on the defendant.

*Babcock Ctr.*, 371 S.C. at 136, 638 S.E.2d at 656. Beyond these exceptions, "[a]n affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *Id.* at 136, 638 S.E.2d at 656–57.

Here, the circuit court based its finding of duty on the third exception—where the defendant voluntarily undertakes a duty. A formulation of this exception is contained in section 323 of the Restatement (Second) of Torts and has been oft-repeated by South Carolina courts:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (Am. L. Inst. 1965); *see also Doe 2 v. Citadel*, 421 S.C. 140, 147, 805 S.E.2d 578, 582 (Ct. App. 2017) ("Under South Carolina law, the Restatement [(Second)] of Torts establishes the recognition of a voluntarily assumed duty . . . ."). "In most of the cases finding liability [for a voluntary undertaking], the defendant has made the situation worse, either by increasing the danger, by misleading the plaintiff into the belief that [the danger] has been removed, or by depriving him of the possibility of help from other sources." W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 56 at 381 (5th ed. 1984). In South Carolina, both subsections of section 323 apply only to duty and not to proximate cause. *Wright v. PRG Real Estate Mgmt., Inc.*, 426 S.C. 202, 219, 826 S.E.2d 285, 294 (2019).

## I.     Internal Policies as a Basis for a Legal Duty

Our courts have held that internal policies cannot establish the voluntary undertaking of a duty pursuant to section 323; instead, they can be used only as evidence to establish the contours of the standard of care once a duty has been

established.  *See Citadel*, 421 S.C. at 148, 805 S.E.2d at 583 ("[W]e find the internal policies created by [the respondent] do not establish a voluntary undertaking of a duty; rather, they can only serve as evidence of the standard of care if the duty was established by law."); *see also Wal-Mart*, 393 S.C. at 248, 711 S.E.2d at 912 (finding that an "internal policy cannot be said to constitute the voluntary undertaking of a duty," but instead could serve only as evidence of the standard of care); *Pacicca v. Jackson*, No. 3:21-CV-03136-DCC, 2023 WL 8242180, at *3 (D.S.C. Nov. 28, 2023) ("[U]nder South Carolina law, a company's internal policies do not establish a duty for purposes of a negligence claim."); *Bernstein v. Walmart, Inc.*, No. 2:22-CV-1637-BHH, 2024 WL 476300, at *4 n.1 (D.S.C. Feb. 7, 2024) ("[W]hile a failure to follow company internal policies 'may be evidence of a breach of a standard of care,' South Carolina law is clear that [the defendant]'s alleged failure to comply with its [standard operating procedure] does not create a duty towards [the plaintiff]." (quoting *Pacicca*, 2023 WL 8242180, at *3)); *see generally Peterson v. Nat'l R.R. Passenger Corp.*, 365 S.C. 391, 397, 618 S.E.2d 903, 906 (2005) ("[W]e hold that evidence of [the r]espondent's deviation from their internal maintenance policies is admissible *to show the element of breach*." (emphasis added)); *Caldwell v. K-Mart Corp.*, 306 S.C. 27, 31, 410 S.E.2d 21, 24 (Ct. App. 1991) ("In negligence cases, internal policies or self-imposed rules are often admissible as relevant on the issue of *failure to exercise due care*." (emphasis added)).

Courts in other jurisdictions have often reached similar conclusions.  *See, e.g.*, *Killian v. Caza Drilling, Inc.*, 131 P.3d 975, 982 (Wyo. 2006) (distinguishing using violations of internal policies as evidence of the standard of care from using the same as evidence of duty); *Zdrojewski v. Murphy*, 657 N.W.2d 721, 729 (Mich. Ct. App. 2002) ("Defendants are correct in their assertion that internal policies of an institution . . . cannot be used to establish a legal duty in a negligence claim."); *Doe v. Coe*, 135 N.E.3d 1, 12 (Ill. 2019) ("We first note that '[w]here the law does not impose a duty, one will not generally be created by a defendant's rules or internal guidelines.  Rather, it is the law which, in the end, must say what is legally required.'" (alteration in original) (quoting *Rhodes v. Ill. Cent. Gulf R.R.*, 665 N.E.2d 1260, 1272 (Ill. 1996))); *Estate of Catlin v. General Motors Corp.*, 936 S.W.2d 447, 451 (Tex. App. 1996) (holding that "the mere creation of an internal policy" prohibiting employees from drinking alcohol did not create a duty to plaintiffs injured by an inebriated employee's conduct and that "[m]ore [wa]s required"); *Doe v. Saint Francis Hosp. & Med. Ctr.*, 72 A.3d 929, 963 (Conn. 2013) ("[A]lthough a violation of an employer's work rules can be viewed as evidence of negligence, . . . regulations and policies do not themselves establish the standard of care." (quoting *Petriello v. Kalman*, 576 A.2d 474, 479 (Conn. 1990))); *Va. Ry. & Power Co. v. Godsey*, 83 S.E.

1072, 1073 (Va. 1915) ("A person cannot, by the adoption of private rules, fix the standard of his duty to others. That is fixed by law, either statutory or common.").

In *Citadel*, a young male (Doe) who was the victim of sexual abuse at the hands of a former camp counselor of The Citadel sued The Citadel alleging that it failed to act on an April 2007 report made to the college's general counsel that the counselor had sexually abused a former camper. 421 S.C. at 142–44, 805 S.E.2d at 579–80. Doe's abuse transpired from the summer of 2005 to the summer of 2007, and although Doe never attended "any summer camps or educational programs at The Citadel," he sued under the theory that but for The Citadel's failure to exercise due care in its 2007 investigation, the former camp counselor would have been exposed sooner and the harm to Doe would have been mitigated. *Id.* at 148, 805 S.E.2d at 582. The Citadel had adopted policies for the oversight of its camps and counselors, which Doe argued "required action following the April 2007 allegations." *Id.* Doe appealed the circuit court's grant of summary judgment in favor of The Citadel, arguing, in part, that these policies established the voluntary undertaking of a duty to investigate and arrest the former camp counselor. This court rejected this argument, finding that "any violation of an internal policy [requiring investigations into allegations of sexual abuse did] not give rise to the voluntary assumption of a duty and [did] not establish that The Citadel owed a duty of care as a matter of law." *Id.* at 149, 805 S.E.2d at 583.

In *Wal-Mart*, the aunt of a minor who was physically and sexually abused sued Wal-Mart for destroying photographs that the aunt had taken to prove to the Department of Social Services that the minor was being abused by the minor's father. 393 S.C. at 242–44, 711 S.E.2d at 909–10. The aunt took the roll of film containing the evidence of abuse to Wal-Mart to have the film developed, but when the aunt returned to pick up the photos, an employee told the aunt that the employee had destroyed some of them because the store's policy required destroying photos depicting nudity. *Id.* at 243, 711 S.E.2d at 909. The minor's abuse was proven several months later, and the aunt, as guardian ad litem for the minor, sued Wal-Mart, alleging that Wal-Mart caused the delay by violating its internal policies that the aunt maintained required the employee to turn the photos over to a supervisor rather than destroy them. *Id.* at 243, 711 S.E.2d at 910. Our supreme court affirmed the circuit court's grant of summary judgment to Wal-Mart, holding that Wal-Mart's internal policy requiring photos depicting nudity be turned over to management "cannot be said to constitute the voluntary undertaking of a duty. Rather, it could simply serve as evidence of the standard of care, once that duty was established by law." *Id.* at 248, 711 S.E.2d at 912.

Here, the circuit court found that Sandpiper "had a policy of providing daily wellness checks and that this policy created a duty to . . . exercise reasonable care in utilizing the systems/protocols it put in place." To the extent that the circuit court relied on the mere existence of Sandpiper's check-in policy to create a duty, we reverse. *See Citadel*, 421 S.C. at 148, 805 S.E.2d at 583 (holding that internal policies do not create voluntary undertakings of a duty); *see also Wal-Mart*, 393 S.C. at 248, 711 S.E.2d at 912 ("It is undisputed that Wal-Mart created an internal policy that was subsequently violated when the photo technician destroyed the photos and did not inform the store manager or keep them as evidence. However, this internal policy cannot be said to constitute the voluntary undertaking of a duty. Rather, it could simply serve as evidence of the standard of care, once that duty was established by law.").

## II.  Analysis Under Section 323 of the Restatement (Second) of Torts

Regardless of whether Sandpiper's check-in policy is an internal policy akin to those in *Citadel* and *Wal-Mart*, no evidence in the record supports the circuit court's conclusion that Parrott's reliance on the check-in policy caused her harm. Respondent points to *Wright* as controlling authority in this regard. In *Wright*, an opinion published after *Citadel* and *Wal-Mart*, our supreme court held that it was a question of fact for the jury as to whether an apartment complex voluntarily assumed a duty under section 323 when it undertook to provide a courtesy officer service to its tenants. 426 S.C. at 220–21, 826 S.E.2d at 295. Specifically, the apartment complex allowed residents affiliated with law enforcement "to receive reduced rent in exchange for their service as courtesy officers for the apartment complex." *Id.* at 207, 826 S.E.2d at 287. Employed as independent contractors for the complex, these courtesy officers were required to devote time to walking the property, answering calls from tenants about incidents on the property, and reporting daily to the property manager. *Id.* The plaintiff in *Wright* was the victim of an armed robbery in the parking lot of the apartment complex. *Id.* at 207–08, 826 S.E.2d at 287–88. Prior to moving in, an apartment complex manager told the plaintiff that there were security officers on duty even though an internal employee manual instructed employees to not indicate that the complex provided security to residents. *Id.* at 206, 826 S.E.2d at 287. However, this internal instruction was not made available to the plaintiff. *Id.* at 206–07, 826 S.E.2d at 287. Our supreme court held that summary judgment was inappropriate because resolution of the factual conflicts underlying the analyses of subsections (a) and (b) of section 323 was in the province of the jury. *Id.* at 221, 826 S.E.2d at 295. Importantly, the court in *Wright* was not asked to address or consider whether the courtesy officer program constituted an internal

policy. The court also emphasized that its holding was tailored to the "existence of a duty under the narrow facts of <u>this case</u>." *Id.* at 220, 826 S.E.2d at 294.

In *Wright*, there was conflicting evidence as to whether the plaintiff relied on the courtesy officer program and whether the plaintiff's harm arose from this reliance. Here, on the other hand, there is no evidence supporting the circuit court's conclusion that Parrott suffered the harm from her long lie because of her reliance on Sandpiper's check-in policy. Specifically, Respondent proffered no evidence to suggest that Parrott took the risk of hanging curtains while standing on a rocking chair—or of not wearing her panic button—*because* she was relying on the expectation that someone from Sandpiper would have come by pursuant to the check-in policy to rescue her. If anything, the evidence in the record suggests that Parrott was not keen on Sandpiper's check-in policy and the panic button system, which undermines the notion that Parrott's harm resulted from her reliance on the check-in policy. *See* Restatement (Second) of Torts § 323(b) (Am. L. Inst. 1965) (recognizing a duty may arise when "the [plaintiff's] harm is suffered *because of* the other's reliance upon the undertaking"); *see also* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 56 at 381 (5th ed. 1984) ("In most of the cases finding liability [for a voluntary undertaking], the defendant has made the situation worse, either by increasing the danger, by misleading the plaintiff into the belief that [the danger] has been removed, or by depriving him of the possibility of help from other sources.").

The *Wright* court held that there was an issue of fact for the jury as to "whether any failure by [the apartment complex] to exercise due care in performing the undertaking [of offering a courtesy officer program] increased the risk of harm to [the plaintiff]." 426 S.C. at 221, 826 S.E.2d at 295. Here, however, the circuit court made no finding under subsection (a) that Sandpiper's negligent execution of its check-in policy increased Parrott's risk of harm. It is therefore unnecessary to analyze the instant case under subsection (a). *See Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("Without an initial ruling by the trial court, a reviewing court simply would not be able to evaluate whether the trial court committed error.").

Because we reverse the circuit court's finding that a duty existed, Respondent's wrongful death claim against Sandpiper must fail. *See Ravan*, 315 S.C. at 467, 434 S.E.2d at 308 ("It is essential [for] liability for negligence to attach that the parties shall have sustained a relationship recognized by law as the foundation of a duty of care."). It is therefore unnecessary to address the remaining issues. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598

(1999) (noting that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

## CONCLUSION

Based on the foregoing, the judgment of the circuit court is

**REVERSED.**

**HEWITT and VINSON, JJ., concur.**